Harry and Esther Simmons v. Commissioner. Burt and Jeanne Rubin v. Commissioner.
Simmons v. Commissioner
Docket Nos. 93236, 93237, 95076, 95077.
United States Tax Court
T.C. Memo 1964-237; 1964 Tax Ct. Memo LEXIS 104; 23 T.C.M. (CCH) 1423; T.C.M. (RIA) 64237; September 9, 1964
*104 Robert W. Taylor, for the petitioners. Gerald J. Robinson, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined the following deficiencies in income tax: Harry and Esther Simmons
1957
$31,033.92
1958
2,591.27
Burt and Jeanne Rubin
1957
34,607.83
1958
2,279.29 By amended answer, respondent increased the deficiencies as follows: Harry and Esther Simmons
1958
$63,137.74
Burt and Jeanne Rubin
1958
62,549.75
The issues presented for decision are: 1. Whether the receipt by Simmons & Company of an option to purchase 60,000 shares of Turbo Dynamics Corporation common stock at one mill per share resulted in the realization by petitioners of taxable income in 1957 and, if so, the amount of income realized; or, alternatively, as raised by respondent in the amended answers, whether the exercise of the option to purchase the Turbo Dynamics Corporation stock resulted in the realization by petitioners of taxable income in 1958, and, if so, the amount of income realized. 2. Whether the bargain purchase by Simmons & Company of 60,000 shares of Imperial Packing Corporation *105 stock at one mill per share resulted in the realization by petitioners of taxable income in 1958 and, if so, the amount of income realized. Findings of Fact Petitioners Harry and Esther Simmons filed joint income tax returns for taxable years 1957 and 1958 with the district director of internal revenue, Manhattan, New York. Petitioners Burt and Jeanne Rubin filed joint income tax returns for taxable years 1957 and 1958 with the district director of internal revenue, Manhattan, New York. Petitioners Harry Simmons and Burt Rubin were each 50 percent partners in Simmons & Company, which was engaged in the sale of investment securities as a broker-dealer during the years in issue. Pursuant to an underwriting agreement dated July 16, 1957, Simmons & Company was retained by Turbo Dynamics Corporation (hereinafter referred to as Turbo) to sell 300,000 shares of its capital stock at $1 per share, in accordance with the registration rules of the Securities Act of 1933 as enforced by the Securities and Exchange Commission. The total authorized capital of Turbo was 10,000,000 shares of common stock, par value of one cent per share, of which 330,000 shares were issued and outstanding *106 immediately prior to the date of the offering. On September 17, 1957, Simmons & Company offered 300,000 shares of Turbo stock to the public at $1 per share. Such shares were registered for public sale under the registration rules of the Securities Act of 1933. By September 29, 1957, Simmons & Company had sold 300,000 registered shares of Turbo stock to the public at $1 per share. On or about July 16, 1957, prior to the offering of shares for public sale, Simmons & Company received from certain shareholders of Turbo an option to purchase 60,000 shares of the common stock of Turbo at one mill per share. Such shares were not registered for public sale under the registration rules of the Securities Act of 1933. The Offering Circular of Turbo, dated September 16, 1957, stated that Simmons & Company's "option is not transferable or exercisable for 13 months from the effective date of this offering and is to be prorated in proportion to the number of shares sold." On July 16, 1958, Simmons & Company exercised its option to purchase 60,000 unregistered shares of Turbo stock. It paid the sum of $60.00 for the shares, issuing checks as follows: Check
No.
Payee
Shares
Amount
4351
A. Fred Thaheld
48,596
$49.60
4352
American Metal Alloys Co.
11,404
11.40
60,000
$60.00
*107 In the general ledger of Simmons & Company for 1958, a memo account called "National City Bank-Vault" showed that the partnership received the 60,000 unregistered shares of Turbo stock on November 30, 1958, and placed them in the valut at the National City Bank on December 15, 1958. At the time of the exercise of the option to purchase 60,000 unregistered shares of Turbo on July 16, 1958, registered stock of Turbo was traded over-the-counter at a bid price of 3 3/8 and an asked price of 3 5/8. At least 21 brokerage companies were making a market in Turbo registered stock during 1957 and 1958. Pursuant to an underwriting agreement entered into in 1958, Simmons & Company was retained by Imperial Packing Corporation (hereinafter referred to as Imperial) to sell 290,000 share of its capital stock at $1 per share, in accordance with the registration rules of the Securities Act of 1933 as enforced by the Securities and Exchange Commission. The total authorized capital of Imperial was 1,000,000 shares of common stock, par value $1 per share, of which 510,000 shares were issued and outstanding immediately prior to the date of the offering. On October 1, 1958, Simmons & Company *108 offered 290,000 registered shares of Imperial stock to the public at $1 per share. No later than October 31, 1958, Simmons & Company had sold 250,000 registered shares of Imperial stock to the public at $1 per share and by November 30, 1958, had sold an additional 40,000 registered shares at $1 per share. In July 1958, prior to the offering date, Simmons & Company purchased from Nicholas J. Winckler, Imperial's controlling stockholder, 60,000 unregistered shares of said corporation's then outstanding common stock at a price of one mill per share, or a total cost of $60.00. The Offering Circular of Imperial, dated October 1, 1958, stated: * * * Simmons & Co. is taking these shares for investment and not with a view to the distribution thereof. The purchaser will not offer or sell such shares, or any of them, for a period of thirteen months from the date of purchase thereof, and in no event except in compliance with the Securities Act of 1933, as amended. * * *
The foregoing is a summary of the principal terms of the said Underwriting Agreement and Dealers' Agreement which summary does not purport to be complete, and reference is hereby made to the Underwriting Agreement *109 and Dealers' Agreement on file with the Underwriter for all of the terms of said agreements. Registered stock of Imperial was traded over-the-counter on October 14, 1958, November 26, 1958, and December 30, 1958, at a bid price of 1 3/8 and an asked price of 1 1/2. At least 21 brokerage companies were making a market in Imperial registered stock during 1958. Between August 10, 1956, and August 12, 1958, 19,615 shares of Imperial stock were sold at $1 per share. The common stock market began an uptrend in early 1958 and by July 1958 it was well established in a firm uptrend. The trend in new issues and the over-the-counter market for speculative stocks in July 1958 was definitely up. The fair market value of the 60,000 unregistered shares of Turbo stock involved herein was $2.75 per share on July 16, 1958. The fair market value of 60,000 unregistered shares of Imperial stock involved herein was 75 cents per share in July 1958. Opinion It is clear that petitioners did not realize income in 1957 upon receipt of the option to purchase 60,000 shares of Turbo stock. If an option to purchase stock with no readily ascertainable market value is not assignable, , *110 or if, even though the option is exercised, the right to receive the stock is contingent, , then receipt of the option does not give rise to income and its realization is deferred until a later time. Quite obviously it was on July 16, 1958, when the option was exercised, that petitioners first realized measurable economic benefit. Under a similar factual situation it was said in (C.A. 2, 1964), affirming a Memorandum Opinion of this Court: * * * The Tax Court characterized the agreement for the sale of stock to petitioners as an "option" and held that income was realized on the date when the option was exercised. * * *
We therefore conclude that the Tax Court did not err in holding that the income in question was realized on May 23, 1955, the date the option was exercised. Thus the principal issue here as to the Turbo stock is whether, when the option was exercised, the stock had an ascertainable market value so as to result in the realization of income to petitioners. Since a 1958 deficiency regarding Turbo stock was first asserted in the amended answers, the burden *111 of proof on this issue rests with respondent. Petitioners argue that the Turbo stock in question had no ascertainable market value since it was unregistered with restrictions as to transferability and, consequently, was not freely salable. Although the terms of granting the option are not in evidence, the Offering Circular states that the "option is not transferable or exercisable for thirteen months from the effective date of this offering," the date of which was September 17, 1957. Yet Simmons & Company, according to the stipulation entered into by petitioners, exercised its option on July 16, 1958. Even if we assume the existence of a restriction in the option agreement, it apparently was abrogated by the partnership's exercise of its option. Furthermore, the option having been exercised, there is no evidence of any restriction on resale by Simmons & Company. The Turbo stock here was not registered in accordance with the registration rules of the Securities Act of 1933 and could not be offered for public sale. However, the incidence of taxation cannot be avoided merely by not registering the stock until after an option is exercised. There was testimony that the unregistered *112 shares could be sold in a so-called "private sale." [1] See In view of the steady increase in the price of Turbo stock in over-the-counter trading, the number of dealers trading in the stock, and the generally healthy state of the market, we think there was an ascertainable market as to the shares here. Respondent's valnation witness gave convincing testimony as to the value of the shares and, in the absence of rebutting evidence, we have accepted it. In assigning to the stock a value lower than the price at which registered stock was selling in the over-the-counter market, we have taken into account the blockage factor, i.e., the size of the stock in relation to the total shares outstanding, and also the fact that the stock was unregistered. Relying on the cases of , , petitioners contend that the Turbo *113 stock in their hands had no ascertainable fair market value. The facts in the instant case are distinguishable from those in Lehman and Kuchman. The issue here was not even present in Lehman since the parties there agreed that the restrictions involved were such as to prevent the ascertainment of fair market value. In Kuchman the respondent's expert witness stated that no purchases for the restricted stock could be found and thus, as a matter of law, there could be no fair market value because no willing buyer was available. Similarly, petitioners' reliance on (C.A. 7, 1956), is misplaced because in that case it was found as a factual matter that lengthy restrictions on sale existed. Moreover, a private sale could have been consummated here which was not the case in MacDonald. Likewise, the facts in (C.A. 2, 1937), are significantly different from those in the instant case. In Propper there was an effective 5 year restriction against sale of the stock, efforts to sell the stock were unsuccessful and the taxpayers produced "ample expert testimony to the effect that the restricted *114 shares either had no fair market value or a nominal value at best." It seems to us the petitioners have a basic misconception of the effect of Federal and security industry regulatory provisions relating to the public sale of securities on the valuation problem. They have erred both in their legal conclusion as to the time of the occurrence of the taxable event and in their factual conclusion as to fair market value. The arguments contained in their brief concerning the rules of the National Quotation Bureau, their argument based on testimony of the Secretary to District Committee No. 12 of the National Association of Security Dealers, Inc., regarding "liquidity of a Broker/Dealer" and their argument based on value under the Securities and Exchange Commission's "net capital" rule are all wide of the mark. The technical requirements which brokers must meet to publicly market stock can, at most, only nominally affect the valuation of securities. We find it unnecessary to become entangled in weighing the effect of regulatory provisions of uncertain application in determining fair market value under the circumstances presented in this case. The rules of the various agencies supervising *115 broker/dealers in distributing stock to the public are based on different premises and are designed to deal with different problems than the rules relating to stock valuation for tax purposes. Furthermore, buyers and sellers of stock such as that involved herein are primarily interested in whether the stock will go up or down in price in the market and other considerations are of comparatively minor importance. As to the Imperial transaction, there has been no direct proof of the terms of the sale of the stock. The Offering Circular, which was a stipulated exhibit without agreement as to the truth of this matter, makes reference to such a prohibition. However, even if we accept the fact of a prohibition, we are unable to find from the language before us that a private sale of unregistered shares is prohibited. Where there is an absolute restriction on transfer, it has been held that no ascertainable value can be found for a speculative security. ; (C.A. 7, 1938). Since it appears from the record before us that *116 at least private sale is possible, we believe an ascertainable fair market value can be found and, therefore, the petitioners realized income from the bargain purchase of Imperial stock in 1958. Respondent has assigned a value of $1 per share to the Imperial stock on the date of purchase and is supported in this by the testimony of an expert valuation witness. It appears, however, that registered Imperial stock was sold at $1 per share prior to the date of the bargain purchase and that the offering underwritten by Simmons & Company was sold at $1 subsequent to that date. To take into account the depressing effect caused by the stock being unregistered and the necessity of selling a large block privately, we have determined a somewhat lesser value. Decision will be entered under Rule 50. Footnotes
1. Q. Can unregistered stock be sold? A. Where it properly - where an exemption under the provisions of the 1933 Act is available, it can be. Q. Is an example of such an exemption the so-called private sale exemption? A. Yes, sir.↩