LOUIS A. AND ALICE A. WEIGL, ET AL.,[1] PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1707–73, 1709–73, 1726–73,     Filed May 30, 1985.
1817–73, 1827–73, 3430–73,
3431–73,   953–74, 8098–76.

*Burton W. Kanter, Harold J. Lipstiz,* and *Charles H. Winkler,* for the petitioners in docket Nos. 1707–73, 1709–73, 1726–73, 1817–73, 1827–73, 3430–73, 3431–73, and 8098–76.

[1]Cases of the following petitioners are consolidated herewith for trial, briefing, and opinion: Joseph and Beatrice E. Mathes, docket No. 1709–73; Walter C. and Alice C. Crawford, docket No. 1726–73; H.L. Federman & Co., Inc., docket No. 1817–73; Hyman L. Federman and Sylvia Federman, docket No. 1827–73; Morris and Ann Leverton, docket No. 3430–73; Morris and Ann Leverton, docket No. 3431–73; Lawrence Eisele and Alma Eisele, docket No. 953–74; and Hyman L. Federman and Sylvia Federman, docket No. 8098–76.

*Louis Sternbach*, for the petitioners in docket No. 953–74.
*Judy Jacobs*, for the respondent.

SWIFT, *Judge*[*]: Respondent determined deficiencies in and additions to petitioners' Federal income tax liabilities as follows:

| | Docket No. | Year | Deficiency | Sec. 6653(a)[2] addition to tax |
|---|---|---|---|---|
| Louis A. Weigl | 1707–73 | 1967 | $178.18 | - - - |
| and Alice A. Weigl | | 1968 | 1,141.56 | - - - |
| | | | | |
| Joseph Mathes | 1709–73 | 1967 | 177.13 | - - - |
| and Beatrice E. Mathes | | 1968 | 1,645.06 | - - - |
| | | | | |
| Walter C. Crawford | 1726–73 | 1967 | 2,896.81 | - - - |
| and Alice C. Crawford | | | | |
| | | | | |
| H.L. Federman & Co., Inc. | 1817–73 | 1966 | - - - | - - - |
| | | 1967 | - - - | - - - |
| | | 1968 | 1,445,483.79 | - - - |
| | | | | |
| Hyman L. Federman | 1827–73 | 1965 | 163,241.88 | $8,162.09 |
| and Sylvia Federman | | 1966 | 2,272.59 | 113.63 |
| | | 1967 | ˙100,889.44 | - - - |
| | | 1968 | 637,530.87 | - - - |
| | 8098–76 | 1969 | 98,643.98 | - - - |
| | | | | |
| Morris Leverton | 3430–73 | 1967 | 103,842.37 | - - - |
| and Ann Leverton | 3431–73 | 1968 | 90,230.97 | - - - |
| | | 1969 | - - - | - - - |
| | | | | |
| Lawrence Eisele | 953–74 | 1969 | 25,815.83 | - - - |
| and Alma Eisele | | | | |

The issues for decision are: (1) Whether the warrants were received by H.L. Federman & Co. (hereinafter Federman Inc.) in its own right or as agent and nominee for its shareholders; (2) whether the warrants were received by Federman Inc. solely as an investment in exchange for the purchase price thereof and not as additional compensation for underwriting

[*]By order of the Chief Judge, these cases were reassigned from Judge William M. Fay to Judge Stephen J. Swift.
[2]Unless otherwise provided, all section references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

services rendered; (3) if the warrants were received by Federman Inc. as compensation, when Federman Inc. must recognize and determine the amount of compensation with respect thereto; (4) whether the assignment by Federman Inc. of the warrants to its shareholders constituted the distribution of a dividend to the shareholders; (5) if so, when the shareholders must recognize and determine the amount of dividend income and the amount thereof; and (6) whether petitioner H.L. Federman is taxable on the income of a foreign situs trust under the grantor trust rules.

Questions regarding the valuation of the warrants involved herein have not yet been tried or briefed. If we conclude that the fair market value of any of the relevant securities must be determined, an additional trial session will be held for that purpose, unless a settlement is reached by the parties with regard to the valuation issues.

For clarity, we will first set out general findings of fact that pertain to the background of the issues to be decided. The general findings of fact will be followed by our separate findings of fact and our opinion as to each separate issue.

## FINDINGS OF FACT

### GENERAL FINDINGS

Some of the facts have been stipulated and are so found.

Federman Inc. had its principal place of business in New York City when its petition was filed herein. Petitioners Lawrence and Alma Eisele resided in New Jersey when they filed their petition herein. Petitioners Morris and Ann Leverton resided in Switzerland when they filed their petitions herein. All other petitioners resided in the State of New York when they filed their petitions herein.

At all relevant times, Federman Inc. was a Delaware corporation principally engaged in the business of underwriting security issues. It was a member of both the New York and American Stock Exchanges and was subject to the rules and regulations of the Securities and Exchange Commission (SEC) and the National Association of Securities Dealers (NASD). The individual petitioners herein, H.L. Federman, Louis A. Weigl (Weigl), Joseph Mathes (Mathes), Morris Leverton (Leverton), Walter C. Crawford (Crawford), and Lawrence Eisele (Eisele), were shareholders of Federman Inc. and, with the exception of

Leverton, were also employees of Federman Inc. More specifically, during the years at issue, the stock of Federman Inc. was owned as follows:

| Stockholder | Date acquired | Date sold or retired | Type of stock | Number of shares |
|---|---|---|---|---|
| R. Mittman | 5/15/63 | - - - | Nonvoting preferred (NVP) | 5 |
| L. Barber | 6/15/63 | 5/10/66 | NVP | 5 |
| W. Crawford | 6/15/63 | 3/19/65 | Common | 25 |
| H.L. Federman | 6/15/63 | - - - | Common | [3]140/171.1 |
| I. Bloomberg | 5/28/64 | 6/30/66 | NVP | 10 |
| H. Herrman | 5/28/64 | 6/30/66 | Common | 85 |
| H. Moore | 5/28/64 | 1966 | Common | 5 |
| L. Eisele | 5/28/64 | 6/30/66 | Common | 20 |
| M. Leverton | 1/11/66 | 6/30/67 | NVP | [4]20 |
| H. Seigl | 2/11/66 | 4/19/66 | NVP | 5 |
| P. Karp | 3/21/66 | - - - | NVP | 98.05 |
| S. Fink | 4/20/66 | - - - | Common | 15 |
| J. Daly | 6/20/66 | - - - | Common | 3.34 |
| L. Weigl | 6/27/66 | - - - | Common | 2.75 |
| J. Mathes | 6/30/66 | - - - | Common | 2.75 |
| G. Feldhamer | 8/31/68 | - - - | Common | 14.63 |
| D. Miller | 1/02/68 | - - - | NVP | 20 |
| N. Miller | 2/09/68 | - - - | NVP | 5 |
| S. Gass | 4/04/68 | - - - | NVP | 20 |
| L. Reich | 4/24/68 | - - - | NVP | 10 |
| M. Rosen | 5/19/68 | - - - | NVP | 20 |
| R. Mittman | 5/20/68 | - - - | NVP | 15 |
| E. Silverston | 8/08/68 | - - - | NVP | 20 |
| S. Silverston | 8/08/68 | - - - | NVP | 10 |
| A. Silverston | 8/21/68 | - - - | NVP | 10 |
| S. Federman | 8/30/68 | - - - | NVP | 10 |

During the years involved herein Federman Inc. was a Wall Street Securities firm that specialized in underwriting stock and debentures issued by small, developing, high-technology companies. In connection with a particular security issue, Federman Inc. either acted as a single underwriter or as a member of a syndicate of underwriters. With respect to the particular stock and debentures involved herein, a syndicate underwrote the securities, but in each underwriting Federman Inc. was the manager of the underwriting or one of the lead

---

[3]Federman owned 140 shares until Sept. 30, 1966, and 171.1 shares thereafter.

[4]Leverton acquired 15 shares on Jan. 11, 1966, and 5 shares on Apr. 19, 1966.

underwriters. NASD rules limited the underwriters' compensation, including reimbursement for expenses and legal fees, to 15-percent of the gross proceeds of an underwriting. SEC rules required a full disclosure of the underwriters' compensation but did not impose any limit on it, nor did the NASD rules preclude the grant to the underwriters of stock options or warrants in the securities of the company whose securities were being underwritten.

It is in the context of the underwritings of four of these companies (namely, Vernitron Corp., National Patent Development Corp., Scientific Control Corp., and DPA, Inc.) that the issues in this case arise.

### CAPACITY IN WHICH FEDERMAN INC. RECEIVED THE WARRANTS

#### Vernitron Corp. Warrants.

In July of 1966, Federman Inc. served as one of the lead underwriters in connection with a public offering by Vernitron Corp. (Vernitron) of 6½-percent convertible subordinated debentures in the principal amount of $1,500,000. Federman Inc. received from Vernitron a commission of $75,000 and reimbursement for expenses of $10,000 in connection with the underwriting.

In addition, the prospectus issued on July 8, 1966, in connection with that offering stated that Vernitron, for a total price of $125, would transfer to Federman Inc. for its investment account, warrants entitling Federman Inc., over the course of 5 years, to purchase at $11.50 per share, 12,500 shares of the common stock of Vernitron. The prospectus also stated that any gain realized by Federman Inc. on the receipt or exercise of the warrants would be treated as additional underwriting compensation for purposes of the Securities Act of 1933.

Substantial underwriting services were performed by Federman Inc. in connection with the issuance of the Vernitron convertible debentures, and on July 15, 1966, Federman Inc., pursuant to the underwriting agreement, received from Vernitron the 12,500 warrants,[5] and Federman Inc. paid to Verni-

---

[5] Pursuant to antidilution provisions, the number of the Vernitron warrants was subsequently increased to 13,128.

tron the $125. The letter from Vernitron transmitting the warrants to Federman Inc. stated that the warrants were granted to Federman Inc., individually, not as a representative or agent of any investors. The Vernitron warrants were not exercisable by Federman Inc. until July 15, 1967, and they expired on July 14, 1971. On July 15, 1966, the Vernitron common stock traded on the American Stock Exchange (ASE) at an average price of $8.625 per share. The Vernitron warrants received by Federman Inc. on July 15, 1966, were not registered with the SEC and thus were not freely transferable.

### National Patent Development Corp. Warrants

In February of 1966, Federman Inc. underwrote the issuance by National Patent Development Corp. (NPDC) of $600,000 principal amount, 6-percent notes and of warrants to acquire 60,000 shares of NPDC common stock. Federman Inc. received from NPDC a commission of $25,000 in connection with the underwriting. In addition, the underwriting agreement, dated February 4, 1966, between Federman Inc. and NPDC stated that "as compensation for services hereunder," Federman Inc. also was to receive warrants to acquire 15,000 shares of NPDC common stock.

The underwriting services were performed by Federman Inc. in connection with the issuance of the NPDC notes and warrants, and on February 4, 1966, pursuant to the underwriting agreement, Federman Inc. received from NPDC warrants to purchase 18,163[6] shares of NPDC common stock at $7.50 per share. On June 30, 1966, Federman Inc. received from NPDC additional warrants to purchase and additional 150 shares of NPDC common stock at the same price. An S-1 registration statement filed by NPDC with the SEC in 1968 and a prospectus published by NPDC in 1968 stated that the NPDC warrants were being granted to Federman Inc. as "a portion of the fees in connection with placement of the [$600,000] promissory notes."

The NPDC warrants received by Federman Inc. were not exercisable until August 4, 1967, and they expired on Febru-

---

[6]No explanation is found in the record as to why or how the number of NPDC shares which Federman Inc. was entitled to receive under the warrants was increased from 15,000 shares to 18,163 shares.

ary 1, 1971. On February 4, 1966, on the over-the-counter market, the mean of the bid and asked price per common share of NPDC stock was $22.37. The NPDC warrants received by Federman Inc. were not registered with the SEC and thus were not freely transferable.

*Scientific Control Corp. Warrants*

In March of 1967, Federman Inc. underwrote the issuance by Scientific Control Corp. (SCC) of 6¾-percent convertible subordinated debentures in the principal amount of $750,000. Federman Inc. received from SCC a commission of $37,500 and reimbursement for expenses of $5,000 in connection with the underwriting.

In addition, the underwriting agreement, dated February 22, 1967, between Federman Inc. and SCC stated that Federman Inc. also would receive from SCC, as a condition of the underwriting services to be performed, a warrant to purchase 25,000 shares of SCC common stock as further compensation for the underwriting services to be rendered by Federman Inc. The underwriting agreement expressly provided that Federman Inc. would receive the SCC warrants "at the closing as an investment for [its] own account" and further that any shares acquired upon exercise of the warrant would be acquired "as an investment for [its] own account."

The underwriting services were performed and, pursuant to the underwriting agreement, on March 13, 1967, Federman Inc. received from SCC a warrant entitling it to purchase 25,000 shares of the common stock of SCC. The warrant was exercisable from April 1, 1967, through March 14, 1968, at $1.25 per share ($2.50 per share after a reverse stock split) and from March 15, 1968, through March 14, 1969, at $1.375 per share ($2.75 per share after a reverse stock split).

The written warrant specified that the warrant was non-transferable by Federman Inc. except "to a successor to Federman Inc. in a merger or consolidation, or to a purchaser of substantially all of the assets of Federman Inc., or to one or more stockholders of Federman Inc. in the event of its dissolution." Federman Inc. paid $2,500 to SCC in connection with receipt of the SCC stock warrant.

Also, in connection with the underwriting of the SCC convertible debentures, on March 31, 1967, Federman Inc.

received from SCC a warrant to purchase an SCC subordinated convertible debenture in the principal amount of $250,000. Federman Inc. paid $9,111 for the SCC convertible debenture warrant. The debenture warrant was exercisable from March 31, 1967, until January 15, 1968, and was convertible into 200,000 shares of SCC common stock for $6.86 per share. The SCC convertible debenture warrant was not registered with the SEC, and thus it was not freely transferable.

In March of 1967, the common stock of SCC was not traded on an established securities market. A prospectus of SCC dated December 21, 1967, stated that the SCC stock warrant and the SCC convertible debenture warrant were issued to Federman Inc. as "consideration" and "compensation" for the underwriting by Federman Inc. of the SCC debentures and therefore that, "Any profits realized on the sale of the warrants, debentures or underlying common stock [which Federman Inc. had received] may constitute additional underwriting compensation."

## DPA Inc. Warrants

In January of 1965, Federman Inc. underwrote the issuance by DPA, Inc. (DPA) of 6½-percent subordinated debentures in the aggregate principal amount of $500,000, with warrants attached to purchase 112,500 shares of DPA common stock. Federman Inc. received from DPA a commission of $10,000, and reimbursement for expenses of $1,500 in connection with the underwriting.

Federman Inc. also received from DPA subordinated debentures in the principal amount of $50,000, warrants to purchase 11,250 shares of DPA common stock (the DPA NO. 1 warrants), and warrants to purchase 5,625 shares of DPA common stock (the DPA NO. 2 warrants). In addition to the services it rendered, Federman Inc. paid DPA $50,000 for the debentures, $3,000 for the DPA NO. 1 warrants, and $1,500 for the DPA NO. 2 warrants. The DPA NO. 1 warrants and the DPA NO. 2 warrants were exercisable from March 1, 1966, until July 1, 1970, at an exercise price of $5 per share during the first year, with the price per share escalating $0.50 each succeeding year. In January of 1965, the DPA common stock was not traded on an established market.

In March of 1965, Federman Inc. served as the lead underwriter in connection with the public offering of an additional 165,000 shares of DPA common stock. Federman Inc. received from DPA an underwriting commission of $13,624 in connection with that underwriting. In March of 1965, Federman Inc. also received from DPA warrants to purchase 8,250 shares of DPA common stock (the DPA NO. 3 warrants). Federman Inc. paid DPA $2,500 for the DPA NO. 3 warrants. The DPA NO. 3 warrants were exercisable from April 1, 1966, until March 31, 1969, at an exercise price of $5.35 per share during the first year, with the price escalating $0.35 per share each succeeding year. On the over-the-counter market in March of 1965, the high and low bid prices of the DPA common stock were $12.625 and $5 per share, and the high and low asked prices were $13 and $6.75 per share.

In April of 1965, Federman Inc. served as the lead underwriter in connection with the issuance by DPA of 6-percent subordinated convertible debentures in the principal amount of $1,500,000. Federman Inc. received from DPA a commission of $75,000, and reimbursement for expenses of $5,000 in connection with the underwriting. On April 21, 1965, Federman Inc. also received from DPA warrants to acquire 18,750 shares of DPA stock (the DPA NO. 4 warrants). Federman Inc. paid DPA $3,750 for the DPA NO. 4 warrants. The DPA NO. 4 warrants were exercisable from April 21, 1965, until March 31, 1970, at an exercise price of $7.50 per share. On April 21, 1965, on the over-the-counter market, the high and low bid prices of the DPA common stock were $10.875 and $10.50 per share.

The warrant agreement issued to Federman Inc. in connection with DPA NO. 3 warrants stated that the issuance of the warrants to Federman Inc. was conditioned on the success of the underwriting of DPA's common stock. The warrant agreement also specified that the warrant was not transferable by Federman Inc. except to a successor in a merger or consolidation. Federman Inc. also represented in the warrant agreement that the warrant was being acquired for its own investment account. Additional significant restrictions were set forth in the warrant agreement that restricted Federman Inc.'s right to transfer the underlying common stock should it acquire the stock through exercise of the warrant.

At the time of delivery of the DPA NO. 4 warrant, H. L. Federman, as President of Federman Inc., signed two letter receipts for the warrant and he 'represented and warranted" therein, that the warrant was received for Federman Inc.'s "own account for investment" and that "no other person has any beneficial interest in, or right to acquire, the warrant or the shares of common stock of [DPA] which may be received upon exercise of said warrant." Further, he stated that the warrant was being delivered by DPA to Federman Inc., "as further compensation for [Federman Inc.'s] services" in connection with the underwriting.

### ACQUISITION OF THE WARRANTS BY THE SHAREHOLDERS

During the years at issue herein, Federman Inc. sought to attract and retain stockholders and employees by periodically assigning to them a portion of some of the warrants, options, and securities it received for underwriting services rendered. Assignments by Federman Inc. to its shareholders and employees, of the Vernitron, NPDC, SCC, and DPA warrants (herein sometimes referred to collectively as the warrants) occurred as follows:

| Warrants | Shareholder[7] | Date of assignment | Number assigned | Charge to stock account |
|---|---|---|---|---|
| Vernitron Corp. | H.L. Federman | Sept. 9, 1966 | 5,928.00 | $59.28 |
| 12,500 warrants | L. Barber | Sept. 9, 1966 | 125.00 | 1.25 |
| | J. Daley | Sept. 9, 1966 | 120.00 | 1.25 |
| | S. Fink | Sept. 9, 1966 | 3,527.00 | 35.27 |
| | P. Karp | Sept. 9, 1966 | 475.00 | 4.75 |
| | J. Mathes | Sept. 9, 1966 | 100.00 | 1.00 |
| | R. Mittman | Sept. 9, 1966 | 125.00 | 1.25 |
| | L. Weigl | Sept. 9, 1966 | 100.00 | 1.00 |
| | M. Leverton | Sept. 9, 1966 | 2,000.00 | 20.00 |
| DPA, Inc. #1 | H.L. Federman | Sept. 9, 1966 | 3,146.13 | 838.98 |
| 11,250 warrants | S. Fink | Sept. 9, 1966 | 1,850.67 | 493.50 |
| | L. Eisele | Sept. 9, 1966 | 444.16 | 118.44 |
| | H. Moore | Sept. 9, 1966 | 111.04 | 29.61 |
| | W. Crawford | June 8, 1966 | 968.00 | 258.13 |
| | J. Bloomberg | June 8, 1966 | 308.50 | 82.27 |

[7]Although Federman Inc. retained possession of most of the warrants, it eventually delivered a portion of the warrants to some of the shareholders.

| Warrants | Shareholder[7] | Date of assignment | Number assigned | Charge to stock account |
|---|---|---|---|---|
| | R. Mittman | June 8, 1966 | 154.25 | $41.13 |
| | L. Barber | June 8, 1966 | 154.25 | 41.13 |
| | H.L. Federman | June 8, 1966 | 4,113.00 | 1,096.80 |
| 5625 DPA #2 warrants | H.L. Federman | June 8, 1966 | 2,047.00 | 545.87 |
| | W. Crawford | June 8, 1966 | 506.00 | 134.93 |
| | J. Bloomberg | June 8, 1966 | 153.00 | 40.81 |
| | R. Mittman | June 8, 1966 | 77.00 | 20.53 |
| | L. Barber | June 8, 1966 | 77.00 | 20.53 |
| | H.J. Moore | Sept. 9, 1966 | 55.30 | 14.75 |
| | L. Eisele | Sept. 9, 1966 | 221.20 | 58.99 |
| | S. Fink | Sept. 9, 1966 | 921.67 | 245.77 |
| | H.L. Federman | Sept. 9, 1966 | 1,566.83 | 417.82 |
| 8250 DPA #3 warrants[8] | H.L. Federman | June 8, 1966 | 1,604.00 | 432.41 |
| | W. Crawford | June 8, 1966 | 302.00 | 224.95 |
| | J. Bloomberg | June 8, 1966 | 121.00 | 32.62 |
| | R. Mittman | June 8, 1966 | 60.00 | 16.17 |
| | L. Barber | June 8, 1966 | 60.00 | 16.17 |
| | H.J. Moore | Sept. 9, 1966 | 43.32 | 11.69 |
| | L. Eisele | Sept. 9, 1966 | 173.28 | 46.79 |
| | S. Fink | Sept. 9, 1966 | 772.00 | 194.94 |
| | H.L. Federman | Sept. 9, 1966 | 1,227.40 | 331.40 |
| 18750 DPA #4 warrants[9] | H.L. Federman | June 8, 1966 | 3,750.00 | 750.00 |
| | J. Bloomberg | June 8, 1966 | 281.00 | 56.20 |
| | R. Mittman | June 8, 1966 | 140.50 | 28.10 |
| | L. Barber | June 8, 1966 | 140.50 | 28.10 |
| | H.J. Moore | Sept. 9, 1966 | 101.26 | 20.25 |
| | L. Eisele | Sept. 9, 1966 | 405.04 | 81.01 |
| | S. Fink | Sept. 9, 1966 | 1,687.67 | 337.53 |
| | H.L. Federman | Sept. 9, 1966 | 2,869.03 | 573.81 |
| Scientific Control Corp. 12,500 warrants (25,000 before adjustment for reverse stock split) | H.L. Federman | May 4, 1967 | 7,077.46 | 1,415.49 |
| | L.Barber | May 4, 1967 | 225.00 | 45.00 |
| | J. Daley | May 4, 1967 | 106.50 | 21.30 |
| | S. Fink | May 4, 1967 | 2,688.54 | 537.71 |
| | P. Karp | May 4, 1967 | 500.00 | 100.00 |
| | M. Leverton | May 4, 1967 | 1,500.00 | 300.00 |
| | J. Mathes | May 4, 1967 | 88.75 | 17.75 |
| | R. Mittman | May 4, 1967 | 225.00 | 45.00 |
| | L. Weigl | May 4, 1967 | 88.75 | 17.75 |

---

[8]On June 8, 1966, Federman Inc. also assigned 3,937 of the DPA #3 warrants, at a charge of $1,192.92, to Coggeshell & Hicks, an underwriting company which also provided underwriting services to DPA.

[9]On June 8, 1966, Federman Inc. also assigned 9.375 of the DPA #4 warrants, at a charge of $1,875.00 to Coggeshell & Hicks. See note 8 *supra*.

| Warrants | Shareholder[7] | Date of assignment | Number assigned | Charge to stock account |
|---|---|---|---|---|
| Scientific | H.L. Federman | Jan. 2, 1968 | [10]64.415% | $5,869.00 |
| Control Corp. | L. Barber | Jan. 2, 1968 | 1.800% | 164.00 |
| debenture | J. Daley | Jan. 2, 1968 | 0.900% | 82.00 |
| purchase | S. Fink | Jan. 2, 1968 | 25.585% | 2,331.00 |
| warrant 100% | P. Karp | Jan. 2, 1968 | 4.000% | 365.00 |
| | J. Mathes | Jan. 2, 1968 | 0.750% | 68.00 |
| | R. Mittman | Jan. 2, 1968 | 1.800% | 164.00 |
| | L. Weigl | Jan. 2, 1968 | 0.750% | 68.00 |
| National Patent | H.L. Federman | May 3, 1966 | 3,000.00 | - - - |
| Development Corp. | H.L. Federman | June 30, 1967 | 2,180.63 | 2,180.63 |
| 14,400 warrants | M. Leverton | May 3, 1966 | 7,125.00 | - - - |
| | L. Eisele | June 30, 1967 | 320.22 | 320.22 |
| | H.J. Moore | June 30, 1967 | 80.06 | 80.06 |
| | L. Barber | June 30, 1967 | 96.19 | 96.19 |
| | R. Mittman | June 30, 1967 | 96.19 | 96.19 |
| | P. Karp | June 30, 1967 | 213.75 | 213.75 |
| | S. Fink | June 30, 1967 | 1,287.96 | 1,287.96 |
| National Patent | H.L. Federman | June 30, 1967 | 1,611.81 | 1,611.81 |
| Development Corp. | L. Eisele | June 30, 1967 | 237.22 | 237.22 |
| 3,163 warrants | H.J. Moore | June 30, 1967 | 59.31 | 59.31 |
| | R. Mittman | June 30, 1967 | 71.17 | 71.17 |
| | L. Barber | June 30, 1967 | 71.17 | 71.17 |
| | P. Karp | June 30, 1967 | 158.15 | 158.15 |
| | S. Fink | June 30, 1967 | 954.17 | 954.17 |

### DISPOSITION OF THE WARRANTS

On November 3, 1967, when the Vernitron common stock was selling on the ASE at $36.50 per share, Federman Inc., for $295,179.15, sold to Commercial Industries warrants to purchase 11,553 shares of Vernitron common stock. Among the warrants sold was a portion of the Vernitron warrants which Federman Inc. had acquired in connection with its July 1966, underwriting of the Vernitron debentures.[11] The proceeds received from Commercial Industries were credited to the investment accounts that were maintained by Federman Inc.

---

[10]Federman received 64% of his interest in the SCC debenture warrant as a result of his status as a common stockholder of Federman Inc. and the remainder of his interest as a result of his status as a preferred stockholder.

[11]Federman Inc. received additional warrants to purchase Vernitron stock in other transactions unrelated to the July 1966 underwriting.

in the name of the following individuals and entities, as follows:

| Investment account | Number of warrants sold | Proceeds |
|---|---|---|
| H.L. Federman | 4,039 | $103,312.70 |
| Barber | 142 | 3,640.60 |
| Daley | 67 | 1,717.75 |
| Fink | 1,484 | 37,782.93 |
| Karp | 315 | 8,075.93 |
| Mathes | 56 | 1,435.68 |
| Mittman | 142 | 3,640.60 |
| Weigl | 56 | 1,435.68 |
| Federman Inc.[12] | 3,939 | 100,602.96 |
| J. Weiss[13] | 1,313 | 33,534.32 |
| Total | 11,553 | 295,179.15 |

In 1968, petitioner Morris Leverton donated 2,000 of his NPDC warrants to a qualified charitable organization and on that basis claimed a charitable deduction of $204,000 on his 1968 Federal income tax return. H.L. Federman donated 113 NPDC warrants to a qualified charitable organization in 1967 and sold 5,000 NPDC warrants for $146,000 in 1968.

On November 18, 1968, Federman Inc. sold 5,170 of the NPDC warrants (4,888 before certain antidilution adjustments) for $580,174.98, and those proceeds were credited to the investment accounts of the following individuals that were maintained by Federman Inc. as follows:

| Investment account | Proceeds |
|---|---|
| H.L. Federman | $148,019.34 |
| Barber | 19,938.96 |
| Eisele | 64,599.66 |
| Fink | 267,220.62 |
| Karp | 44,306.76 |
| Mittman | 19,938.96 |
| Moore | 16,150.68 |
| Total | 580,174.98 |

On January 3, 1968, when the value of the SCC common stock was $26 per share, Federman Inc. exercised the SCC stock warrants and paid the exercise price of $31,250 to SCC.

---

[12]Federman Inc. also maintained a separate investment account for itself.

[13]J. Weiss was an employee of Federman Inc.

Federman Inc. made entries on its books apparently charging each shareholder his pro rata share of the exercise price.

On September 13, 1967, when the fair market value of the DPA common stock was $10 per share, 30,563 of the DPA NO. 1 through NO. 4 warrants were exercised by Federman Inc., and Federman Inc. paid the exercise price of $185,761.56 to DPA. Federman Inc. made entries on its books apparently charging each shareholder his pro rata share of the exercise price.

Neither Federman Inc. nor the shareholders reported any income on their Federal income tax returns in connection with their receipt of any of the warrants. The shareholders did, however, report long-term capital gain when the warrants or the shares of stock acquired as a result of the exercise of the warrants were subsequently sold.

In his notices of deficiency, respondent determined that the warrants did not have a "readily ascertainable fair market value" within the meaning of sections 1.61–15 and 1.421–6, Income Tax Regs., at the time Federman Inc. first received them, and that, therefore, Federman Inc. realized compensation income, and the shareholders realized dividend income, when the warrants were either exercised or transferred by Federman Inc. in an arm's-length transaction. The amount determined by respondent of compensation income to Federman Inc. and dividend income to the shareholders was either the difference between the exercise price and the value of the property received upon exercise of the warrants or the amount of any gain resulting from transfer of the warrants.

## THE ANNUITY TRANSACTION

On April 15, 1968, Yaacov Meridor, an Israeli citizen, established a trust under the laws of the Bahama Islands (herein the trust) by transferring $5,000 to the corpus of the trust and naming H.L. Federman's wife, Sylvia, as the sole beneficiary. Meridor was a friend and business associate of H.L. Federman, and established the trust at H.L. Federman's request. Castle Trust Co., Ltd. (hereinafter referred to as either Castle or the trustee), a trust company incorporated under the laws of the Bahama Islands, was named as the initial trustee of the trust.

Under the terms of the trust agreement, the trustee was authorized to distribute trust corpus to Sylvia Federman and

to loan her money from the trust, interest free. Sylvia Federman was granted a power of appointment over the trust corpus, exercisable in favor of anyone except herself or her creditors. She was also authorized to appoint an "Advisory Committee" consisting of five or less members that was not to include herself or the named settlor, Yaacov Meridor. She was not precluded from appointing H.L. Federman to the advisory committee. That committee was authorized to direct the investments of the trust; and the trustee, in carrying out those directions, would be absolved of any liability for the investments. Additionally, Sylvia Federman was authorized to remove the trustee without cause and to appoint a successor trustee. The trustee's obligation to make the annuity payments was dependent upon the trust's having sufficient assets and income to satisfy that obligation.

On July 3, 1968, H.L. Federman entered into an annuity agreement with Castle, as trustee of the trust, under which he agreed to transfer his 64-percent equitable interest in the SCC convertible debenture warrant to the trust in return for an annual payment of $40,612.17 for his life. The amount of the annual payment was calculated on the basis of a fair market value for the 64-percent interest in the SCC convertible debenture warrant of $475,000.[14]

On July 10, 1968, the shareholders who owned the remaining 36-percent equitable interest in the SCC convertible debenture warrant agreed to sell for $325,000 their interests in the warrant to Castle, acting for its own investment account and not in its capacity as trustee of the trust. The agreement provided that $100,000 of the purchase price was payable by Castle on August 15, 1968, and the balance was due on January 31, 1969.[15]

---

[14] The parties used table I of sec. 20.2031–7(f), Gift Tax Regs., to calculate the annual annuity payment of $40,612.17, as follows:

Federman's age .............................................................................. 59
Present worth of the annuity under table I,
  sec. 20.2031–7(f), Gift Tax Regs ......................................................... 11.6960
Agreed fair market value of 64% interest in
  SCC convertible debenture warrant ...................................................... $475,000
Annual payment equals .......................................................... $\dfrac{\text{Agreed fair market value}}{11.6960}$

[15] In 1968 payment of $315,415 of the $325,000 purchase price owed by Castle was actually made by Federman Inc., not by Castle.

After the equitable interest in the SCC convertible debenture warrant was transferred to Castle, both as trustee of the trust (64-percent) and for its own investment account (36-percent), Federman Inc. immediately exercised the warrant on behalf of both the trust and Castle by purchasing SCC convertible debentures for $250,000. Then, on July 24, 1968, after the debentures were converted into 36,443 shares of SCC common stock, Federman Inc. entered into an agreement with Patrick Martin (Martin) for the sale to Martin of those shares for $1,202,619, or $33 per share, as well as for the sale of an additional 95,000 shares of SCC common stock, also at $33 per share.

The annuity agreement represented the culmination of protracted negotiations between H.L. Federman and Martin whereby Martin sought to gain control of SCC. In the agreement, Federman Inc. represented that it was "acting as principal and as agent for certain holders of the common stock [SCC]." The annuity agreement was executed by H.L. Federman on behalf of Federman Inc., by H.L. Federman, individually, and by Martin, but was not executed by or on behalf of Castle or the trust.

Martin agreed to pay $100,000 of the $1,202,619 purchase price for the 36,443 shares upon the execution of the annuity agreement, with $250,000 due November 11, 1968, and the remaining balance due on or before December 11, 1968. Martin made these payments directly to Federman Inc. After deducting advances it had made on behalf of the trust and Castle, including amounts it paid to exercise the SCC debenture warrant and to convert the debenture into SCC stock, Federman Inc. turned the remaining proceeds over to Castle. Federman Inc. also charged the trust and Castle $54,665 as a commission for the sale of the 36,443 shares.

At no time relevant to the instant case did Sylvia Federman know that she was the beneficiary of the trust nor, for that matter, was she even aware that the trust existed. H.L. Federman made all business and financial decisions for himself and his wife. When H.L. Federman asked his wife to execute documents, she would often do so without reading them or questioning H.L. Federman about their contents.

Sometime between 1969 and 1972, the trust made an interest-free, unsecured loan of approximately $400,000 nomi-

nally to Sylvia Federman. The trust gave the loan proceeds directly to H.L. Federman, and he immediately reloaned the money to Federman Inc. Sylvia Federman was never aware that either of these loans had been made. Subsequently, Federman Inc. was liquidated after suffering severe financial difficulties and neither H.L. Federman, Sylvia Federman, nor Federman Inc. ever repaid the loan to the trust.

During the period of 1969 through 1971, H.L. Federman received three "annuity payments" of $40,612.17 from the trust. Thereafter, no further "annuity payments" were made to H.L. Federman.

On their 1968 Federal income tax return, H.L. and Sylvia Federman reported no gain from the transfer of H.L. Federman's 64-percent interest in the SCC debenture warrant to the trust, nor did they report any gain from the subsequent sale of the SCC stock acquired as a result of the exercise of that warrant.[16] In his notice of deficiency, respondent determined that the Federmans realized ordinary income of $561,488 as a result of these transactions.

OPINION

*Issue 1. Capacity in Which Federman Inc.
Received the Warrants*

The question of who is the owner of property for Federal income tax purposes is a question of fact that must be determined from an examination of all the relevant facts and circumstances. *Schoenberg v. Commissioner*, 302 F.2d 416 (8th Cir. 1962), affg. a Memorandum Opinion of this Court; *Snyder v. Commissioner*, 66 T.C. 785 (1976); *Hook v. Commissioner*, 58 T.C. 267 (1972).[17] Such an examination in this case speaks loudly and clearly and allows only one conclusion—namely, that Federman Inc. received the warrants in question herein as a principal, on its own behalf, and as a result of underwriting services it performed. The services were performed and the warrants were received pursuant to legal contracts that required Federman Inc. to perform those services and that

---

[16]On their 1969 through 1971 Federal income tax returns, Mr. and Mrs. Federman reported long-term capital gains of $25,453.10 based on their receipt of the annuity payments.

[17]See also *Beran v. Commissioner*, T.C. Memo 1980–119.

required the issuing companies to transfer the warrants to Federman Inc. for services rendered.

The warrants were issued to Federman Inc., not to the shareholders. The nominal purchase price that usually was required was paid by Federman Inc., not by the shareholders. Upon acquisition, the warrants were accounted for as warrants of Federman Inc. on Federman Inc.'s records. They were not accounted for as securities of the shareholders or employees, nor were they placed in a nominee or street account.

The extensive documentation associated with the underwriting transactions (as described in the findings of fact herein) uniformly describe the receipt of the warrants by Federman Inc. in its capacity as legal, equitable, and beneficial owner thereof. Affirmative representations by Federman Inc. and by the issuing companies are set forth in the documentation to the effect that Federman Inc. was receiving the warrants on its own behalf and not for anyone else's beneficial or equitable ownership. We so hold.

Petitioners argue that the warrants could not possibly have been owned by Federman Inc. because Federman Inc. did not have enough capital to pay the exercise price. Such an argument we find disingenuous. Federman Inc. and its officers were sophisticated in the securities and financial markets and surely were aware of credit sources to fund the exercise of stock warrants when and if the economics thereof justified exercise of the warrants.

Petitioners argue that we should elevate substance over form and hold that because Federman Inc. (some months after its acquisition of the warrants) transferred some of the warrants to its shareholders, Federman Inc. never was the owner of the warrants. Petitioners' position is completely contrary to both the form and substance of the transactions in question, and we reject petitioner's arguments on this issue.

*Issue 2. Were the Warrants Received by Federman Inc. as Compensation for Services Rendered?*

The Court having found that the warrants were received by Federman Inc. as the owner thereof, petitioners argue that the receipt of the warrants represented a stock investment by Federman Inc. in exchange for the price paid therefor. See sec.

1.61–15(b)(1)(ii), Income Tax Regs.[18] Respondent argues that the receipt by Federman Inc. of the warrants was compensation for underwriting services rendered.

Again, the documentation associated with each underwriting transaction involved herein establishes the compensatory nature of the receipt by Federman Inc. of the warrants. Self-serving testimony by the individual petitioners herein that the warrants were not received as compensation for underwriting services does not begin to overcome the extensive documentation to the contrary.

Petitioners argue that the fact that Federman Inc. paid some cash for the "purchase" of most of the warrants demonstrates the noncompensatory nature thereof. In fact, the purchase price of the warrants was nominal under any measurement, even taking into account the restrictions placed on the warrants.[19]

Petitioners also argue that since Federman Inc. received cash compensation from the companies for whom it performed the underwriting services, the transfer to Federman Inc. of the warrants was not intended as compensation. We disagree. The warrants clearly represented compensation to Federman Inc. in addition to the cash compensation, and the fact that some regulatory authorities placed limits on the amount of cash compensation underwriters could be paid apparently did not inhibit payment to the underwriters of compensatory stock options in addition to cash compensation. Certainly, in light of the disclosures in the prospectus material concerning the warrants, the regulatory authorities were fully advised of the receipt of the warrants by Federman Inc. and of the compensatory nature thereof, and apparently they raised no objection to

---

[18]Sec. 1.61–15(b), Income Tax Regs., in pertinent part provides—

(b) *Options to which paragraph (a) does not apply.* (1) Paragraph (a) of this section does not apply to:

* * * * * * *

(ii) An option which is not granted as the payment of an amount constituting compensation, such as an option which is acquired solely as an investment (including an option which is part of an investment unit described in paragraph (b) of sec. 1.1232–3).

[19]As stated earlier, in addition to the services rendered, Federman Inc. paid a total of $125 for the Vernitron warrants; nothing for the NPDC warrants; $2,500 for the SCC warrants; $3,000 for the DPA No. 1 warrants; $1,500 for the DPA No. 2 warrants; $2,500 for the DPA No. 3 warrants; and $3,750 for the DPA No. 4 warrants.

the grant of the warrants to Federman Inc. in the manner and for the purposes described in the prospectus material.

Under section 1.61–15(b)(2), Income Tax Regs., if a nonqualified option or warrant to acquire stock has a readily ascertainable value within the meaning of section 1.421–6, Income Tax Regs., the recipient of the nonqualified option or stock warrant may be able to establish that the option or warrant was not received as compensation for services by showing that the amount of money paid for the option or warrant equaled the fair market value thereof[20] thereby avoiding any compensatory element on receipt of the warrants. This argument, however, is not available to petitioners herein since they concede on brief that the stock warrants in question would not be treated as having a readily ascertainable fair market value at the time of receipt of the warrants if the valuation rules of section 1.421–6, Income Tax Regs., are applicable to the stock warrants in question.[21]

Also, under section 1.61–15(b)(2), Income Tax Regs., if a stock warrant does not have a readily ascertainable fair market value, it may still be possible to establish that the warrant was not received as compensation for services if the recipient can establish that "there was no reason" for the

-----

[20]Sec. 1.61–15(b)(2), Income Tax Regs., provides—

(2) If a person acquires an option which is not subject to the rules contained in section 421, and if such option has a readily ascertainable fair market value, such person may establish that such option was not acquired as payment of an amount constituting compensation by showing that the amount of money or its equivalent paid for the option equaled the readily ascertainable fair market value of the option. If a person acquires an option which is not subject to the rules contained in section 421, and if such option does not have a readily ascertainable fair market value, then to establish that such option was not acquired as payment of an amount constituting compensation, such person must show that, from an examination of all the surrounding circumstances, there was no reason for the option to have been granted as the payment of an amount constituting compensation. For example, such person must show that he had neither rendered nor was obligated to render substantial services in consideration for the granting of the option. In determining whether an option, such as an option acquired in connection with an obligation as part of an investment unit, has been granted as compensation for services, the ordinary services performed by an investor in his own self-interest in connection with his investing activities will not be treated as the consideration for the grant of the option. For example, if a small business investment company takes an active part in the management of its debtor small business company, the rendering of such management services will not be treated as the consideration for the granting of the option, provided such services are rendered for an independent consideration, or are merely protective of the small business investment company's investment in the borrower. See paragraph (c) of sec. 1.421–6 for the meaning of the term "readily ascertainable fair market value."

[21]The valuation rules of sec. 1.421–6, Income Tax Regs., as in effect during the years involved herein, and the validity thereof are discussed in more detail in connection with our discussion of issue 3 *infra*.

warrant to have been received as compensation for services. As we have stated, the evidence is clear that the warrants received by Federman Inc. were received because of, in connection with, and specifically as compensation for underwriting services rendered by Federman Inc. to the issuing corporations.

*Issue 3. When Must Federman Inc. Recognize and Determine the Amount of the Compensation Income it Received as a Result of the Receipt of the Stock Warrants?*

Petitioners contend that regardless of the valuation criteria of section 1.421–6(c), Income Tax Regs., as in effect during the years involved herein,[22] the stock warrants in question had a

---

[22] Sec. 1.421–6(c), Income Tax Regs., which is applicable to nonstatutory stock options and warrants that were granted on or after Feb. 26, 1945, and before July 1, 1969, provides in pertinent part as follows—

(c) *Options with a readily ascertainable fair market value.* (1) If there is granted an option to which this section applies and which has a readily ascertainable fair market value (determined in accordance with subparagraphs (2) and (3) of this paragraph) at the time the option is granted, the employee in connection with whose employment such option is granted realizes compensation at such time in an amount equal to the excess, if any, of such fair market value over any amount paid for the option. If an option to which this section applies does not have a readily ascertainable fair market value at the time the option is granted, the time when the compensation is realized and the amount of such compensation shall be determined under paragraph (d) of this section.

(2) Although options may have a value at the time they are granted, that value is ordinarily not readily ascertainable unless the option is actively traded on an established market. If an option is actively traded on an established market, the fair market value of such option is readily ascertainable for purposes of this section by applying the rules of valuation set forth in sec. 20.2031–2 of this chapter (the Estate Tax Regulations).

(3)(i) When an option is not actively traded on an established market, the fair market value of the option is not readily ascertainable unless the fair market value of the option can be measured with reasonable accuracy. For purposes of this section, if an option is not actively traded on an established market, the option does not have a readily ascertainable fair market value when granted unless the taxpayer can show that all of the following conditions exist:

(a) The option is freely transferable by the optionee;

(b) The option is exercisable immediately in full by the optionee;

(c) The option or the property subject to the option is not subject to any restriction or condition * * * which has a significant effect upon the fair market value of the option or such property; and

(d) The fair market value of the option privilege is readily ascertainable in accordance with subdivision (ii) of this subparagraph.

(ii) The option privilege in the case of an option to buy is the opportunity to benefit during the option's exercise period from any increase in the value of property subject to the option during such period, without risking any capital. Similarly, the option privilege in the case of an option to sell is the opportunity to benefit during the exercise period from a decrease in the value of the property subject to the option. For example, if at some time during the exercise period of an option to buy, the fair market value of the property subject to the option is greater than the option's exercise price, a profit may be realized by exercising the option and immediately selling the property so acquired for its higher fair market value. Irrespective of whether any such gain may be realized immediately at the time an option is granted, the fair market value of an option includes

readily ascertainable fair market value upon receipt by Federman Inc. Petitioners therefore contend that the value of the warrants must be determined and includable in petitioners' income at that time. Petitioners' contentions are based on the argument that the regulations are invalid insofar as they make the valuation rules set forth therein applicable to independent contractors and that the specific rules provided in the regulations for stock options and warrants are invalid.

Respondent contends that the regulations are valid and that under the valuation rules set forth therein, the value of the warrants in question could not be determined on the date the warrants were received by Federman Inc. and therefore the value of the warrants and the amount of compensation income Federman Inc. must report with respect thereto must be determined on the date of exercise of the warrants or on the date of an arm's-length transfer of the warrants, if such a transfer occurred before the warrants were exercised.

The applicable Treasury regulation specifically provides that the valuation rules of section 1.421–6, Income Tax Regs., apply not only to employees but also to independent contractors. Express reference also is made in the regulation to the application of those valuation rules to underwriters of securities.[23]

Treasury regulations are not to be rejected unless they are found to be unreasonable and plainly inconsistent with the statute, *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501 (1948). Treasury regulations, "should not be overruled

---

the value of the right to benefit from any future increase in the value of the property subject to the option (relative to the option exercise period), without risking any capital. Therefore, the fair market value of an option is not merely the difference that may exist at a particular time between the option's exercise price and the value of the property subject to the option, but also includes the value of the option privilege for the remainder of the exercise period. Accordingly, for purposes of this section, in determining whether the fair market value of an option is readily ascertainable, it is necessary to consider whether the value of the entire option privilege can be measured with reasonable accuracy. In determining whether the value of the option privilege is readily ascertainable, and in determining the amount of such value when such value is readily ascertainable, it is necessary to consider—

    (*a*) Whether the value of the property subject to the option can be ascertained;

    (*b*) The probability of any ascertainable value of such property increasing or decreasing; and

    (*c*) The length of the period during which the option can be exercised.

[23]The pertinent portion of sec. 1.61–15(a), Income Tax Regs., provides—

"This section, for example, makes the rules of section 1.421–6 applicable to options granted in whole or partial payment for services of an independent contractor. [See also sec. 1.421–6(b)(3), Income Tax Regs., which makes specific reference to the application of the valuation rules of sec. 1.421–6, Income Tax Regs., to underwriters of securities.]"

except for weighty reasons" (*Bingler v. Johnson*, 394 U.S. 741, 750 (1969); *Edward L. Stephenson Trust v. Commissioner*, 81 T.C. 283, 287 (1983)); and "the choice among reasonable alternatives is for the Commissioner, not the Courts." *National Muffler Dealers Association v. United States*, 440 U.S. 472, 488 (1979); *Allen Oil Co. v. Commissioner*, 614 F.2d 336, 340 (2d Cir. 1980).

A significant factor in considering the validity of Treasury regulations is the length of time the regulations have been outstanding. *United States v. Correll*, 389 U.S. 299, 305–306 (1967); *Commissioner v. Estate of Sternberger*, 348 U.S. 187, 190 (1955). An application of the above standards to section 1.61–15, and to section 1.421–6, Income Tax Regs., requires a decision upholding the validity of those regulations.

Petitioners refer to a number of the early changes made to sections 1.61–15, and to section 1.421–6, Income Tax Regs.,[24] and petitioners infer therefrom that the Treasury initially doubted the propriety of applying the valuation rules of section 1.421–6, Income Tax Regs., to independent contractors. Although some of the early changes in the regulations may have reflected some uncertainty on the part of the Treasury in the late 1950's and early 1960's as to the treatment of stock options received by independent contractors, they do not suggest any uncertainty in that regard on the part of the Treasury in the more recent 20-plus years since the regulations were finalized.

Contrary to petitioners' contention, the significance, if any, to be drawn from the background of section 1.61–15, Income Tax Regs., is that the instant question received considerable attention prior to the finalization of the regulations in 1963. For example, the identical argument asserted by petitioner herein (namely, that the tax treatment of stock options received by independent contractors for services rendered should be different from the tax treatment of stock options

---

[24]As originally proposed on Nov. 10, 1956, sec. 1.421–6, Income Tax Regs., was not made applicable to independent contractors. 21 Fed. Reg. 8774 (1956). However, in 1959 when the regulation was issued in final form it was made applicable to independent contractors. T.D. 6416, 1959–2 C.B. 126 (Sept. 22, 1959). Thereafter independent contractors were alternatively excluded, included, and then once again excluded from the coverage of the regulation. See T.D. 6481, 1960–2 C.B. 159 (July 8, 1960), and T.D. 6540, 1961–1 C.B. 161 (Jan. 17, 1961). Finally, on Dec. 9, 1963, sec. 1.421–6, Income Tax Regs., was once again made applicable to independent contractors by the promulgation of sec. 1.61–15, Income Tax Regs. T.D. 6696, 1963–2 C.B. 23.

received by employees) was made in 1960, in Fleischer & Meyer, "Tax Treatment of Securities Compensation: Problems of Underwriters," 16 Tax L. Rev. 119, 147 (1960). See also Horwich, "Tale of Two Dicta: The Non-Restricted Stock Option" 18 U. Miami L. Rev. 596, 601 (1964); Baker "Nonstatutory Stock Options," 87–3rd Tax Management A–2—A–3 (1983) (87–3rd Tax Management was revised and superseded in 1984 by Billman, "Nonstatutory Stock Options," 383 Tax Management). That argument was rejected in 1963 by the adoption of section 1.61–15, Income Tax Regs., and we discern no basis for rejecting those regulatory provisions today.

Court decisions that have addressed the tax rules applicable to the receipt of stock options by independent contractors support the validity of section 1.61–15 and section 1.421–6, Income Tax Regs. In affirming a Memorandum Opinion of this Court, the Second Circuit, in *Victorson v. Commissioner*, 326 F.2d 264 (2d Cir. 1964), held that a right to purchase stock that was given to an underwriter for services rendered was an option, and measured the taxable income to the underwriter as of the date the option was exercised. Although the years involved in that case preceded the effective date of the regulations, the Second Circuit expressly stated that "Treas. Regs. §1.421–6(d)(2)(i) * * * was made applicable to underwriters' stock options by Treas. Dec. 6669." (326 F.2d at 267 n. 2.)

*LeVant v. Commissioner*, 45 T.C. 185 (1965), revd. and remanded on another issue 376 F.2d 434 (7th Cir. 1967), primarily concerned the proper tax treatment of an exchange of stock options for stock in another corporation. The individual taxpayer in that case initially had been an independent contractor and then converted to employee status. This Court discussed at length the valuation rules of section 1.421–6, Income Tax Regs., and specifically commented on the application of section 1.61–15, Income Tax Regs., as follows:

Section 1.61–15, Income Tax Regs., provides that if a person receives an option, not subject to section 421, in payment of an amount constituting compensation of such person, such option is subject to the rules contained in section 1.421–6 of the regulations for purposes of determining when income is realized in connection with such option and the amount of such income. [45 T.C. at 197.]

In *Frank v. Commissioner*, 54 T.C. 75 (1970), affd. 447 F.2d 552 (7th Cir. 1971), which concerned the receipt of options by

an officer-employee, we again commented on the application of section 1.61–15, Income Tax Regs., as follows:

Section 1.61–15, Income Tax Regs., which was added to the regulations subsequent to the years at issue makes the rules contained in sec. 1.421–6 of such regulation applicable to options granted certain non-employees after July 11, 1963. [54 T.C. at 86 n. 4.][25]

In the above *Frank* opinion, a statement also was made concerning the policy underlying, and the validity of, the valuation rules of section 1.421–6(d), Income Tax Regs., as follows:

Surely, it cannot be considered unreasonable to require reasonable accuracy in the valuation of stock options. To hold otherwise would be to encourage estimates of fair market value of such rights on the basis of pure speculation and surmise. [54 T.C. at 94.]

That policy is as applicable to options received by independent contractors as it is to options received by employees. See also 2 J. Mertens, Law of Federal Income Taxation, sec. 11.10, at .34–36 (1982 rev.), which comments favorably on the application of the valuation rules of section 1.421–6(d) to independent

---

[25]In this Court's opinion in *Victorson v. Commissioner*, T.C. Memo. 1962–231, we stated—

"On brief petitioners suggest that a different rule may apply in the present case to an underwriter which receives a stock option as part of its compensation for services rendered than in the more usual case of an employee receiving such an option. However, petitioners do not suggest what this different rule should be or why it should be different. Given the same options in both situations, we know of no reason why an independent contractor should be treated differently from an employee with regard to the realization of income upon the exercise of a compensatory stock option. [21 T.C.M. 1238, at 1245 n. 1, 31 P-H Memo T.C. par. 62,231, at 1378–62 n. 1; citations omitted.]"

*McNatt v. Commissioner*, T.C. Memo. 1962–99, affd. on other issues sub nom. *Frank v. Commissioner*, 321 F.2d 143 (8th Cir. 1963), involved the receipt of options by independent promoters of the stock of a corporation and expressly applied the rationale of *LoBue v. Commissioner*, 351 U.S. 243 (1956), to independent contractors. We stated therein—

"In the instant case even though the contract does not specifically refer to an option being granted to Frank and McNatt, and Frank and McNatt were not employees of Bankers and Peoples, the agreement to permit them to purchase stock in Bankers and Peoples was in the nature of an option granted to them for services rendered or to be rendered and the problem here involved is similar to that involved in the case of an option given to an employee. [21 T.C.M. 542, at 553, 31 P-H Memo T.C. par. 62,099, at 62–613.]"

*Simmons v. Commissioner*, T.C. Memo. 1964–237, also involved the receipt of stock options by an underwriter for services rendered. Therein, this Court stated that—

"receipt of the option does not give rise to income and its realization is deferred until a later time. Quite obviously it was * * * *when the option was exercised,* that petitioners first realized *measurable* economic benefit. [23 T.C.M. 1423, at 1425, 33 P-H Memo T.C. par. 64,237, at 1560–64; emphasis supplied.]"

contractors, pursuant to the authority of section 1.61–15, Income Tax Regs.

The application of the valuation rules of section 1.421–6, Income Tax Regs., in numerous additional court decisions further supports the validity of those valuation rules, as set forth in the regulation. See, for example, *Shamburger v. Commissioner*, 508 F.2d 883 (8th Cir. 1975), affg. 61 T.C. 85 (1973); *Mitchell v. Commissioner*, 590 F.2d 312 (9th Cir. 1979), affg. 65 T.C. 1099 (1976); *Wanvig v. Commissioner*, 295 F. Supp. 882 (E.D. Wis. 1969), affd. on other grounds 423 F.2d 769 (7th Cir. 1970).

Under the valuation rules of section 1.421–6(c), Income Tax Regs., the stock warrants in question herein must be held not to have had an ascertainable fair market value upon receipt by Federman Inc. since (1) they were not traded on an established securities market, (2) they were not transferable by Federman Inc. except under very limited conditions, (3) they were not immediately exercisable, and (4) the value of the option privilege could not have been readily ascertained.

Since the stock warrants involved herein did not have a readily ascertainable fair market value at the time of receipt by Federman Inc., under section 1.421–6(c), Income Tax Regs., the receipt thereof by Federman Inc. was not taxable at that time. Rather, the warrants generally would be taxable to Federman Inc. at the time of exercise of the warrants, or if an arm's-length transfer of the warrants occurred before exercise of the warrants, at the time of the arm's-length transfer.

If a non-arm's-length transfer of the warrants occurred before exercise of the warrants, receipt of the warrants would be taxable to Federman Inc. at the time of exercise of the warrants by the transferee, and the amount of compensation income to Federman Inc. (in the year of exercise by the transferee) would be measured by the difference between the fair market value of the stock received by the transferee on exercise of the warrants and the exercise price of the warrants. Sec. 1.421–6(d), Income Tax Regs.[26] The rationale for

---

[26]Sec. 1.421–6(d), Income Tax Regs., provides—

(d) *Options without a readily ascertainable fair market value.* If there is granted an option to which this section applies, and if the option does not have a readily ascertainable fair market value at the time it is granted, the employee in connection with whose employment the option is granted is considered to realize compensation includible in gross income under section 61 at the time and

deferral of the taxation with respect to options and warrants until exercise thereof, where a non-arm's-length transfer of options or warrants occurs, is the same rationale (previously discussed herein) for the deferral of taxation of options and warrants upon original receipt thereof where the fair market value of options and warrants at the time of original receipt is not readily ascertainable.

The periodic transfers on the books of Federman Inc. of the warrants from Federman Inc. to the shareholder and/or employee investment accounts were not made at arm's length. The amounts charged to the shareholders on the books were simply pro rata portions of the nominal amounts Federman Inc. had paid for the warrants. No attempt was made by Federman Inc. or by the shareholder transferees of the warrants to value the warrants or to negotiate the amount to

---

in the amount determined in accordance with the following rules of this paragraph:

(1) Except as provided in subparagraph (2) of this paragraph, if the option is exercised by the person to whom it was granted, the employee realizes compensation at the time an unconditional right to receive the property subject to the option is acquired by such person, and the amount of such compensation is the difference between the amount payable for the property and the fair market value of the property at the time an unconditional right to receive the property is acquired. An individual has an unconditional right to receive the property subject to the option when his right to receive such property is not subject to any conditions, other than conditions that may be performed by him at any time. Thus, if an individual who has exercised an option has a right to make payment for the property at any time and to receive the property immediately after making such payment, such individual realizes compensation at the time he exercises the option. However, if an individual who has exercised an option is prevented by the terms of the option contract from making payment immediately or from receiving an immediate transfer of the property after making payment, such individual does not realize compensation at the time he exercises the option. Such individual will not realize compensation until he does acquire the right to make payment immediately and to receive an immediate transfer of the property. For purposes of this paragraph, an unconditional right to receive the property subject to the option shall not be considered to have been acquired before the date on which the option is exercised.

(2)(i) If the option is exercised by the person to whom it was granted but, at the time an unconditional right to receive the property subject to the option is acquired by such person, such property is subject to a restriction which has a significant effect on its value, the employee realizes compensation at the time such restriction lapses or at the time the property is sold or exchanged, in an arm's length transaction, whichever occurs earlier, and the amount of such compensation is the lesser of—

(a) The difference between the amount paid for the property and the fair market value of the property (determined without regard to the restriction) at the time of its acquisition, or

(b) The difference between the amount paid for the property and either its fair market value at the time the restriction lapses or the consideration received upon the sale or exchange, whichever is applicable.

If the property is sold or exchanged in a transaction which is not at arm's length before the time the employee realizes compensation in accordance with this subdivision, any amount of gain which the employee realizes as a result of such sale or exchange is includible in gross income at the time of such sale or exchange, but the amount includible in gross income under this subdivision at the time of the expiration of the restriction or the sale or exchange at arm's length shall be reduced by the amount of gain includible in gross income as a result of the sale or exchange not at arm's length.

be charged to the shareholder accounts at the time the warrants were credited thereto.

For the reasons explained above, the warrants are not taxable to Federman Inc. at the time the warrants originally were received in connection with the underwriting services rendered, nor at the time the bookkeeping entries were made crediting the warrants to the shareholder investment accounts.

A portion of the Vernitron and NPDC warrants involved herein were sold by Federman Inc. and/or by the shareholders prior to exercise of the warrants. To the extent those sales were made in arm's-length transactions, Federman Inc. is taxable in the year of those sales based on the amount realized from the sales over its adjusted basis in the warrants. The net amount realized on the sales is taxable to Federman Inc. as compensation income.

Some of the NPDC warrants were contributed by the shareholder/employees to charitable organizations. Since a charitable contribution is not an arm's-length transaction (*Jones v. Commissioner*, 1 T.C. 1207, 1212 (1943)), Federman Inc. is not to be taxed on the warrants at the time of the contributions of the warrants, but Federman Inc. is taxed on the warrants at the time the recipients of the contributions either exercise the warrants or transfer them in an arm's-length transaction.

As described more fully in our findings of fact, on July 3, 1968, H.L. Federman's interest in the SCC convertible debenture warrant was transferred to a foreign situs trust in return for annual annuity payments for his life of $40,612.17. Additionally, on July 10, 1968, the other shareholders with interests in the SCC convertible debenture warrant sold their interests therein to the same foreign trust. Although the facts are not entirely clear, it appears that the price paid by the foreign trust for the purchase of the shareholders' interests in the SCC convertible debenture warrant and for the annuity obligation given to H.L. Federman was reached at arm's length and reflected the underlying market value of the stock.[27]

---

[27]The value placed on the 64-percent interest in the SCC warrant that the foreign trust received from H.L. Federman was $475,000, and the value placed on the remaining 36-percent interest in the SCC warrant that the foreign trust received from the other shareholders was $325,000. Additionally, 2 weeks after it acquired the warrant, on July 24, 1968, the foreign trust

Accordingly, with respect to the SCC convertible debenture warrant, Federman Inc. will be taxed in 1968 on the amount realized by H.L. Federman from the sale of his interest in the warrant (namely, $475,000 reduced by costs) and on the net amount realized by the other shareholders on their sale of their interest in the warrant (namely, $325,000 reduced by costs) to the foreign trust. To the extent respondent disagrees as to the arm's-length nature of the amount paid by the foreign trust or of the value placed on the annuity, respondent should notify the Court and a further hearing will be held with respect thereto in connection with further hearings that may be required herein on questions of fair market value.

The remaining Vernitron, NPDC, and DPA warrants (that were exercised directly by Federman Inc. or by the shareholders) will be taxable to Federman Inc. in the year the respective warrants were exercised, and the compensation income to be taxed to Federman Inc. will be calculated based on the difference between the costs associated with the acquisition of the stock (namely, warrant price plus exercise price) and the fair market value of the stock received.

### Issue 4. Did the Shareholders Realize Dividend Income Upon the Transfer by Federman Inc. of the Warrants to Them? If so, How Is That Income to be Measured?

The issue of whether the shareholders of Federman Inc. (individual petitioners herein) are to be taxed on the transfer by Federman Inc. of the warrants to acquire the stock turns, in part, on whether the options were transferred to the individual petitioners as compensation for services rendered.[28] If so, the receipt of the stock warrants by the shareholders is governed by section 1.61–15(b) and section 1.421–6, Income Tax Regs. (the validity and application of which previously

---

simultaneously exercised the warrant, paid the exercise price of $250,000, received the convertible debenture, converted the debenture into SCC common stock, and sold the SCC common stock so acquired for $1,202,619. This latter amount (apparently reflecting a sale of securities in the open market and therefore an arm's-length transaction) appears to correlate with the total value of $1,050,000 placed on the SCC warrant by the foreign trust at the time that the debenture warrant was transferred to it, when the additional expenses of selling the stock are taken into account.

Our conclusion as to the arm's-length nature of the value placed on the SCC warrant by the foreign trust pertains solely to the instant issue. See our opinion herein, *infra*, concerning the tax effect of the annuity transaction.

[28]This issue is to be distinguished from issue 2, *supra*, which pertained to the compensatory nature of the warrants to Federman Inc.

have been discussed herein), and the shareholders would not realize ordinary income at the time their investment accounts were credited with the shares but at the time of a subsequent exercise or arm's-length transfer of the warrants.

Based on our examination of the evidence, it is concluded that the warrants were not transferred to the shareholders as compensation for services rendered but as a distribution of corporate property. This conclusion is supported by the essentially pro rata nature of the distributions of the warrants to the shareholders of Federman Inc., and by the extensive documentation in evidence which consistently refers to the transfer of the warrants to the shareholders as dividend distributions.

The Federal income tax consequences of distributions of corporate property are governed generally by the rules of sections 301 and 317. Section 301(a) provides as follows:

> SEC. 301(a). IN GENERAL.—Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c).

The above statutory language is clearly broad enough to include options and warrants to acquire stock in another corporation, unless such options and warrants are not "property" as defined in section 317(a). The definition of property in section 317(a) is very broad and includes all types of property except the distributing corporation's own stock and options or warrants to acquire such stock. Section 317(a) provides—

> SEC. 317(a). PROPERTY.—For purposes of this part, the term "property" means money, securities, and any other property; except that such term does not include stock in the corporation making the distribution (or rights to acquire such stock).

It follows from the above statutory provisions that a distribution by a corporation to its shareholders of options to acquire stock in another corporation is a dividend if the distributing corporation has sufficient earnings and profits.[29]

---

[29]The applicability (to a transaction governed by the Internal Revenue Code of 1954, as amended) of dicta to the contrary in a pre-1954 Code decision of the Supreme Court (*Palmer v. United States*, 302 U.S. 63 (1937)), is highly questionable. That dictum stated that—

"The mere issue of rights to subscribe and their receipt by stockholders, is not a dividend. No

As explained by the Supreme Court in *Commissioner v. Gordon*, 391 U.S. 83, 89 (1968)—

> Whether the actual dividend occurs at the moment when valuable rights [such as stock options and warrants] are distributed or at the moment when their value is realized through sale or exercise, it is clear that when a corporation sells corporate property to stockholders or their assignees at less than its fair market value, thus diminishing the net worth of the corporation, it is engaging in a "distribution of property" as that term is used in § 316. [Fn. ref. omitted.]

The time when a dividend distribution must be included in income of the shareholder and the amount of the distribution are determined according to section 1.301–1(b), Income Tax Regs., as follows:

> (b) *Time of inclusion in gross income and of determination of fair market value.*—A distribution made by a corporation to its shareholders shall be included in the gross income of the distributees when the cash or other property is unqualifiedly made subject to their demands. However, if such distribution is a distribution other than in cash, the fair market value of the property shall be determined as of the date of distribution without regard to whether such date is the same as that on which the distribution is includible in gross income.

Generally, pursuant to the above regulation, the value to a shareholder of a dividend distribution will be determined at the time of the distribution. Under the open transaction doctrine of *Burnet v. Logan*, 283 U.S. 404 (1931), however, the amount to a shareholder of a dividend of property other than cash will be determined at a later time if, as of the date of the dividend or of the declaration thereof, the fair market value of the property distributed cannot be ascertained. *Baumer v. United States*, 580 F.2d 863 (5th Cir.), rehearing denied 585 F.2d 520 (1978).

Only "in rare and extraordinary cases does property have no fair market value." Sec. 1.453–6, Income Tax Regs. In "those

---

distribution of corporate assets or diminution of the net worth of the corporation results in any practical sense. * * * They are at most options or continuing offers, potential sources of income to the stockholders through sale or the exercise of the rights. [302 U.S. at 71.]"

For an extensive discussion of *Palmer* and the confusion caused by the above-quoted dicta, see Gann, "Taxation of Stock Rights and Other Options: Another Look at the Persistence of *Palmer v. Commissioner*," 1979 Duke L. J. (Pt. 2) 911; Carlson, "Taxation of 'Taxable' Stock Rights: The Strange Persistence of *Palmer v. Commissioner*," 23 Tax L. Rev. 123 (1967–68); *Baumer v. United States*, 580 F.2d 863, 878–884 (5th Cir.), rehearing denied 585 F.2d 520 (1978).

rare circumstances where no fair market value of the property [distributed] can be ascertained * * * the courts have found it necessary to treat the transaction as 'open' until the value can be ascertained." *Baumer v. United States, supra* at 885. See also *Burnet v. Logan, supra*; *Estate of Meade v. Commissioner*, 489 F.2d 161, 163 (5th Cir. 1974), cert. denied 419 U.S. 882 (1974); *Dennis v. Commissioner*, 473 F.2d 274, 285 (5th Cir. 1973).

Respondent argues that the valuation rules of section 1.421–6, Income Tax Regs. (the specific provisions of which have been explained in connection with our discussion of the taxability to Federman Inc. of its receipt of the warrants), as a matter of law, should govern our determination under section 1.301–1(b), Income Tax Regs., of the value of the warrants that were distributed to the shareholders. Respondent points out that if the valuation rules of section 1.421–6, Income Tax Regs., are not applied to our determination of the amount of the dividend distribution of the warrants, the anomalous result may be produced that the warrants are not taxed to Federman Inc. as compensation income until the time of exercise of the warrants (under the valuation rules of section 1.421–6, Income Tax Regs.), but the warrants are taxed to the shareholders as dividend income at the time of the shareholder distributions (under section 1.301–1(b), Income Tax Regs.).

There is some authority that the valuation rules of section 1.421–6, Income Tax Regs., may be relevant to determine the valuation of property under section 1.301–1(b), Income Tax Regs. See *Baumer v. United States, supra* at 885. We are not convinced at this point, however, that the valuation rules of section 1.421–6, Income Tax Regs., as a matter of law, should govern the valuation necessary under section 1.301–1(b), Income Tax Regs., and we defer ruling on that specific point.

In this case, the parties have not yet submitted evidence as to the fair market value, at any point in time, of the warrants in question, and they have stipulated that all questions of fair market value will be deferred until resolution of the other issues addressed herein. Accordingly, the parties are to notify the Court as to whether it will be necessary to schedule for further hearings this issue concerning the value of the dividend distributions along with other valuation issues.

## Issue 5. Annuity Transaction

The final issue requires us to determine the Federal income tax consequences to petitioners H.L. Federman and Sylvia Federman of the sale of a 64-percent equitable interest in the SCC convertible debenture warrant to the foreign trust and of the subsequent sale of the stock acquired by the foreign trust as a result of the exercise of the warrant. Petitioners H.L. Federman and Sylvia Federman contend that H.L. Federman sold his interest in the warrant to the trust in exchange for an annual annuity and that the gain on the sale should be recognized only when the annual annuity payments are received.[30] See sec. 72; Rev. Rul. 69–74, 1969–1 C.B. 43. Respondent counters that the transaction did not constitute a bona fide exchange for an annuity. Instead, respondent argues that the transfer of the 64-percent interest in the warrant and the subsequent sale of the stock by the trust constituted, in substance, nothing more than the sale of that stock by H.L. Federman in his individual capacity and should be taxed accordingly. For the reasons set forth below, we agree with respondent that H.L. Federman's transfer of his interest in the warrant was not a bona fide exchange for an annuity. However, rather than concluding, as respondent does, that the substance of the transaction was simply the sale of the SCC stock by H.L. Federman, we find, instead, that H.L. Federman transferred the warrants in trust and that based on his relationship to the foreign trust he is taxable on the trust's income pursuant to the grantor trust rules of sections 671 through 678.

The pivotal question is whether H.L. Federman retained control and beneficial enjoyment of the warrants transferred to the trust.[31] Although a taxpayer has the legal right to structure a transaction so as to lower his tax liability (see *Gregory v. Helvering*, 293 U.S. 465, 469 (1935)), it is well established that Federal tax consequences turn on the substance of a transaction rather than on its form, unless a particular statute indicates that the form is to govern. See

---

[30] On their 1969 through 1971 joint Federal income tax returns, Mr. & Mrs. Federman reported long-term capital gains of $25,453.10 based on their receipt of annuity payments.

[31] In his notice of deficiency, respondent did not assert this issue and, consequently, the burden of proof is on respondent as to this issue. Rule 142(a), Tax Court Rules of Practice and Procedure.

*Stern v. Commissioner,* 747 F.2d 555, 558 (9th Cir. 1984), revg. and remanding 77 T.C. 614 (1981); *Lazarus v. Commissioner,* 58 T.C. 854, 864 (1972), affd. 513 F.2d 824 (9th Cir. 1975). More particularly, "in determining whether [taxpayers] have structured a valid annuity plan or have simply transferred property in trust and reserved a life estate therein, substance and not form is controlling. The essence of the arrangement 'is determined not by subtleties of draftsmanship but by their total effect.' " *Lazarus v. Commissioner, supra* at 828–829.

In determining whether a series of related transactions that took the form of a sale of property to a trust in exchange for an annuity was, in substance, a transfer in trust by a grantor-owner, this Court has looked at several factors, including: (1) The relationship between the creation of the trust and the transfer of property to the trust; (2) the relationship between the income generated by the transferred property and the amount of the annuity payments; (3) the degree of control over the transferred properties exercisable by the annuitant; (4) the nature and extent of the annuitant's continuing interest in the transferred properties; (5) the source of the annuity payment; and (6) the arm's-length nature of the annuity/sale arrangement. See *Stern v. Commissioner, supra; La Fargue v. Commissioner,* 73 T.C. 40 (1979), affd. in part and revd. in part 689 F.2d 845 (9th Cir. 1982):[32] *Lazarus v. Commissioner, supra; Estate of Fabric v. Commissioner,* 83 T.C. 932 (1984); *Bixby v. Commissioner,* 58 T.C. 757 (1972); *Archbishop Samuel Trust v. Commissioner,* 36 T.C. 641 (1961); affd. sub nom. *Samuel v. Commissioner,* 306 F.2d 682 (1st Cir. 1962).[33]

In the context of the instant case, we find that this issue can be decided primarily on the basis of the degree of control Federman maintained over the transferred property. In *Samuel v. Commissioner, supra* at 687, the Court of Appeals for the First Circuit stated—

Inherent in the concept of an annuity is a transfer of cash or property from one party to another in return for a promise to pay a specific periodic sum for a stipulated time interval. As such, an annuity contract gives rise to a debtor-creditor relationship between the transferee and transferor. * * *

[32]We express no opinion herein as to whether we agree with the Ninth Circuit's reversals of our opinions in *Stern v. Commissioner,* 747 F.2d 555 (9th Cir. 1984), and *La Fargue v. Commissioner,* 73 T.C. 40 (1979), affd. in part and revd. in part 689 F.2d 845 (9th Cir. 1982)

[33]See also *Horstmier v. Commissioner,* T.C. Memo. 1983–409.

\* \* \* once the annuitant has transferred the cash or property to the obligor and has received his contractual right to periodic payments, he is unconcerned with the ultimate disposition of the property transferred once it is in the obligor's hands.

The test of control that can be drawn from *Samuel* is a practical one—that is, whether or not the purported annuitant maintained "effective control" of the transferred property. Moreover, as we stated in *Bixby v. Commissioner*, 58 T.C. 757, 789 (1972), this test—

should be applied in a strict fashion in order to curb abuses in the area of private annuities. The outcome in each case will depend upon the attendant facts as viewed, we hope, in the light of reality. The fact that "annuity agreements" were executed is, of course, not controlling.

In this case, it is clear that H.L. Federman retained effective control of his interest in the SCC debenture warrant. For example, one of the trust provisions allows Mrs. Federman, as the beneficiary of the trust, to exercise her power of appointment over the trust assets in favor of H.L. Federman. Since H.L. Federman made all of Mrs. Federman's business and financial decisions, this provision of the trust effectively preserved control over the transferred property in H.L. Federman.

H.L. Federman's continuing control of the transferred property is also evidenced by other trust provisions that permit the trustee to lend Sylvia Federman money on an unsecured, interest-free basis and to distribute all of the corpus or income to her. While those decisions would have to be made by the trustee, the evidence in this case demonstrates that the trustee maintained little, if any, independence from H.L. Federman. For instance, the sale by the foreign trust of the SCC shares acquired as a result of the exercise of the SCC debenture warrant was negotiated exclusively by H.L. Federman and Federman Inc. Although petitioners contend that H.L. Federman and Federman Inc. were acting merely as agents of the trust, neither of them executed the agreement on behalf of either Castle or the trust. Similarly, we find it difficult to believe that the trustee was acting independently of H.L. Federman when it made the unsecured, interest-free loan of approximately $400,000 to Sylvia Federman. The trustee

never consulted Sylvia Federman before making the loan, and the proceeds of the loan were paid directly to H.L. Federman.

The trustee's lack of independence from H.L. Federman was anticipated in, and was facilitated by, the provisions of the trust agreement. Thereunder, Sylvia Federman had the right to appoint H.L. Federman as the sole member of the "Advisory Committee." In that event, H.L. Federman would have had the power to direct the investment of the trust assets, and the trustee would have been absolved of any liability for imprudent investments of trust principal. Although the record does not indicate whether such an appointment was ever made, it is clear from the record that H.L. Federman acted as if he had that authority.

In addition, the tie-in between the obligation to make the annuity payments and the trust's income (as evidenced by the trust's failure to make the annual annuity payments after the default occurred on the $100,000 unsecured loan owed to the trust) supports our holding that the transfer was not a sale in exchange for an annuity but a transfer in trust with retained control over the trust property. See *Stern v. Commissioner*, *supra* at 558, *Estate of Fabric v. Commissioner, supra* at 939.

In summary, based primarily on H.L. Federman's control over the trust and, therefore, over the SCC debenture warrant after it was transferred to the trust and on the tie-in between the annuity payments and the trust's income, we conclude that the transaction was in substance a transfer in trust subject to retained control and beneficial enjoyment of the property.

In view of the above holding, we also find that H.L. Federman was the settlor of the trust and that the named settlor, Yaacov Meridor, H.L. Federman's friend and business associate, was the settlor in name only. This conclusion is based on the following factors: (1) The named settlor contributed only a nominal amount of the trust's corpus ($5,000) in comparison to the substantial amount transferred to the trust by H.L. Federman (see *Bixby v. Commissioner, supra*); (2) the creation of the trust and the transfer by H.L. Federman occurred in relatively close proximity of time (see *Estate of Schwartz v. Commissioner*, 9 T.C. 229, 239 (1947)); (3) the named settlor's attenuated connection to Sylvia Federman; and (4) the named beneficiary of the trust reflects H.L.

Federman's desires as to the lifetime and testamentary disposition of his property.

Finally, since H.L. Federman was in substance the grantor of the trust, the grantor trust rules of sections 671 through 678 come into play. Under those rules, H.L. Federman is taxable on the income attributable to any portion of a trust over which he is deemed to be the "owner." Sec. 671. Since Sylvia Federman had the right, through her power of appointment, to demand that all of the trust income and corpus be distributed to H.L. Federman at any time, and since H.L. Federman made all financial decisions for Sylvia Federman, under section 677(a)(1), H.L. Federman must be treated as the owner of the entire trust for purposes of the grantor trust rules. Accordingly, in 1968 H.L. Federman is taxable on the entire amount of the trust income, including the gain the trust realized from the July 24, 1968, sale of the SCC stock.

To reflect the foregoing,

*An appropriate order will be entered.*

Reviewed by the Court.

DAWSON, STERRETT, WILBUR, NIMS, PARKER, SHIELDS, CLAPP, and JACOBS, *JJ.*, agree with the majority opinion.

SIMPSON, WHITAKER, KÖRNER, and GERBER, *JJ.*, did not participate in the consideration of this case.

———

FAY, *J.*, dissenting: I respectfully dissent as to the majority's holding that "the readily ascertainable fair market value" rules of sections 1.61–15 and 1.421–6, Income Tax Regs., are valid insofar as they apply to stock warrants received as compensation by independent contractors. I disagree with what I consider to be the majority's conclusory analysis and its expansive use of prior case law to resolve this issue.

First, the majority emphasizes that the regulations here in issue have been in existence for over 20 years and are thus entitled to great deference. Such emphasis implies that the regulations have been applicable to all options granted since the date of their adoption. In fact, however, these regulations apply to options granted before July 1, 1969. See sec.

1.421–6(a)(2), Income Tax Regs. As to options granted on and after that date, section 1.83–7, Income Tax Regs., and not section 1.421–6, Income Tax Regs., is the controlling authority. See sec. 1.83–8(b), Income Tax Regs. Thus, while the regulations may have been in existence for over 20 years, they have been inapplicable with respect to options granted during the last 15 of those years.

Moreover, the majority cites several cases which it contends support the validity of the regulations. See pp. 1215–1217 *supra*. However, none of these cases specifically considered whether section 1.61–15, Income Tax Regs., is valid in making the rules contained in section 1.421–6, Income Tax Regs., applicable to independent contractors. Neither this Court, nor any other Court to our knowledge, has specifically addressed this issue before.

The majority first cites *Victorson v. Commissioner*, 326 F.2d 264 (2d Cir. 1964), and notes that "although the years involved in that case preceded the effective date of the regulations, the Second Circuit expressly stated that 'Treas. Regs. §1.421–6(d)(2)(i) * * * was made applicable to underwriters' stock options by Treas. Dec. 6669.' [326 F.2d at 267 n. 2.]" It is difficult to see how this statement, which appears in a footnote in the Second Circuit's opinion, supports the validity of applying the regulations to independent contractors. That court did not even apply, let alone consider the validity of, the regulations. Rather, it merely observed that T.D. 6669 (Dec. 11, 1963) made the rules of section 1.421–6, Income Tax Regs., applicable to options received by underwriters.

The majority next cites *LeVant v. Commissioner*, 45 T.C. 185 (1965), revd. and remanded on another issue 376 F.2d 434 (7th Cir. 1967). It states that, in *LeVant*, this Court "discussed at length the valuation rules of section 1.421–6, Income Tax Regs., and specifically commented on the application of section 1.61–15, Income Tax Regs." In *LeVant*, however, which involved an option received by an employee, the Court did not address the application of section 1.61–15, Income Tax Regs., to independent contractors, nor did it consider whether such application would be valid. Rather, in the context of discussing options granted to employees, it simply paraphrased the language of the regulation. Thus, *LeVant* does not support the

validity of applying the rules of section 1.421–6, Income Tax Regs., to options received by independent contractors.

The majority next cites *Frank v. Commissioner*, 54 T.C. 75 (1970), affd. 447 F.2d 552 (7th Cir. 1971). Once again, it seizes upon language contained in a footnote to conclude that "we again commented on the application of section 1.61–15, Income Tax Regs." In *Frank*, in which the taxpayer was specifically held to be an employee, this Court similarly did not apply or address the validity of section 1.61–15, Income Tax Regs. It merely observed that that section makes the rules contained in section 1.421–6, Income Tax Regs., applicable to options granted to certain non-employees after July 11, 1963.[1]

Thus, the majority concludes that the regulations are valid based on nothing more than the fact that they have been in existence for a long period of time and upon its misconception that several Court decisions support their validity. I do not believe that the majority is justified in implying that the courts in the above-cited cases considered the regulations valid merely because they commented on their applicability. The instant case presents the first opportunity either this or any Court has had to consider the validity of the application of the regulations to options received by independent contractors, and in my view, requires a more thorough analysis.

For the following reasons, I would conclude that sections 1.61–15 and 1.421–6, Income Tax Regs., are invalid to the extent they make the rules of section 1.421–6, Income Tax Regs., applicable to options received as compensation by independent contractors. Accordingly, I would hold that the amount of the corporation's income arising from the receipt of such warrants must be determined at the time the warrants were received, not when the warrants were subsequently exercised or transferred in an arm's-length transaction.

Although Treasury regulations are not to be rejected unless they are found to be unreasonable and plainly inconsistent with the statute (*Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501 (1948)), a regulation is not a reasonable statutory interpretation unless it harmonizes with the plain language of

---

[1] In note 25 of its opinion, the majority cites several memorandum opinions of this Court. However, in these cases the Court neither applied nor considered the validity of applying the valuation rules of sec. 1.421–6, Income Tax Regs., to stock options received by independent contractors.

the statute, its origins, and its purpose. *National Muffler Dealers Association v. United States*, 440 U.S. 472, 477 (1979).

Sections 1.61–15 and 1.421–6, Income Tax Regs., were promulgated to deal with the administrative difficulties respondent faced in attempting to value nonstatutory options not traded on an established market. It is a basic rule under our tax laws that property received as compensation for services must be included in income to the extent of its fair market value at the time of receipt. See sec. 1.61–2(d)(1), Income Tax Regs. Only in rare and extraordinary cases will property not have an ascertainable value. See *United States v. Davis*, 370 U.S. 65 (1962). In promulgating sections 1.61–15 and 1.421–6, Income Tax Regs., respondent took the position that the receipt of options as compensation can be one of these "rare and extraordinary" cases.

The rules contained in sections 1.61–15 and 1.421–6, Income Tax Regs., were certainly not derived from any specific statutory language. Section 421 provides special tax treatment for certain qualifying options granted to employees; however, no provision is made for options, such as the warrants herein, which do not so qualify. Section 61 simply provides a sweeping definition of "gross income," including "compensation for services, including fees, commissions, and similar items." Sec. 61(a)(1).

The origin of these regulations can be traced instead to a series of cases which culminated in the Supreme Court's decision in *Commissioner v. LoBue*, 351 U.S. 243 (1956). In *LoBue*, the Court was faced with the question of the taxability of options granted to employees. The options at issue were nontransferable and their exercise was conditioned upon the continued employment of the recipient. In holding that the options constituted compensation income to the extent of the difference between the option price and the fair market value of the stock acquired upon the exercise of the options, the Supreme Court stated:

It is of course possible for the recipient of a stock option to realize an immediate taxable gain. See *Commissioner v. Smith*, 324 U.S. 177, 181–182. The option might have a *readily ascertainable market value* and the recipient might be free to sell his option. But this is not such a case. These three options were not transferable and LoBue's right to buy stock under them was contingent upon his remaining an employee of the company until they were exercised. Moreover, the uniform Treasury practice since 1923 has

been to measure the compensation to employees given stock options subject to contingencies of this sort by the difference between the option price and the market value of the shares at the time the option is exercised. [*Commissioner v. LoBue*, 351 U.S. at 249; emphasis added.]

Clearly, the distinction made in section 1.421–6, Income Tax Regs., between options with and without a "readily ascertainable fair market value" was derived from this language in *LoBue*. However, neither *LoBue* nor any of the preceding cases in this area ever indicated that these rules should be applied, as they are under section 1.61–15, Income Tax Regs., to options received by independent contractors. See *Commissioner v. Smith*, 324 U.S. 177 (1945). *Commissioner v. Estate of Stone*, 210 F.2d 33 (3d Cir. 1954), affg. 19 T.C. 872 (1953); *McNamara v. Commissioner*, 210 F.2d 505 (7th Cir. 1954), revg. 19 T.C. 1001 (1953). For the following reasons, the rationale in *LoBue* strongly suggests that at least in the typical independent contractor situation the Court would have reached the opposite conclusion.

In *LoBue*, the Court emphasized that the stock options at issue were nontransferable *and* the employee's right to exercise them was contingent upon his remaining in the employment of the company. When both of these restrictions are imposed, I think it is clear that the intent of the employer and employee is that the value of the "bargain purchase" made at the time of the exercise of the option, rather than the option itself, will constitute compensation. Through his continued employment, an employee contributes to the appreciation in the value of the stock subject to the option from the date the option is received until the date it is exercised. Thus, in the employee stock option situation there is justification for viewing the "bargain purchase" as compensation. Moreover, where the employee is required to remain in the employment of the company as a condition to exercising the option, there is a real possibility that this condition will not be satisfied and that the option will never even be exercisable. Thus, when such a condition is imposed, it is not inappropriate to defer taxation until the time when the condition is satisfied and the option is in fact exercised.

In contrast, the two factors emphasized in *LoBue* are not present in the typical independent contractor situation. For example, the corporation herein was not under any obligation

to perform services after it received the warrants and, thus, exercise of the warrants could not be made contingent upon continued rendering of services. Although there were various restrictions on the transferability of the warrants and the corporation was generally not allowed to exercise them for a certain period of time, these restrictions were not imposed by the issuers to ensure continued rendering of services but instead were primarily intended to satisfy SEC requirements. Therefore, such restrictions do not change the intent of the parties that the value of the warrants themselves constitute the compensation for the services rendered. Moreover, the sole restriction on exercise of the warrants in this case was the lapse of time, a condition which was certain to eventually be satisfied. Thus, the uncertainty as to whether the warrants would become exercisable which was present in *LoBue,* wherein exercisability was contingent upon future employment, is simply not present here. Finally, since the corporation was not under any obligation to render services after it received the warrants, it certainly could not have been assumed that the corporation would thereafter contribute to any appreciation in the value of the stock subject to the warrants or to the resulting appreciation in the value of the warrants, themselves. Thus, to treat any part of that appreciation as compensation income strikes me as being unreasonable and inconsistent with the plain meaning of the phrase "compensation for services" in section 61.

It is also noteworthy that measuring compensation income on the basis of the "bargain purchase" made at the time of the exercise of the option, rather than by the value of the option when it is received, can have substantial harsh consequences. The corporation herein will be forced to include as ordinary income, rather than capital gain, the appreciation in the stock subject to the warrants, even though such appreciation resulted from the steep rise in stock market prices and was wholly unrelated to the services rendered by the corporation. The following example is helpful in understanding the unfairness of this result.

Assume that an attorney performs services worth approximately $1,000 for a client and, instead of cash, is given warrants similar to the ones given to the corporation herein. The attorney performs no further services for the client. If the

attorney exercises the warrants when the underlying stock has a fair market value of $50,000, he will, under the majority's holding, have $50,000 of ordinary income at the time of exercise, even though his services were only worth approximately $1,000 and he never again dealt with the client. Since the $49,000 increase in value had no relationship to the value of the services rendered, I believe the correct and fair result is for taxability to be governed by section 1.61–2(d), Income Tax Regs., under which receipt of the warrants would be the taxable event, with the measure of income being the fair market value of the warrants on the date received. Thus, in my example, the attorney would include $1,000 in ordinary income at the time the warrants were received, and the $49,000 increase in value would ultimately be taxed as a capital gain. Following this rationale, identical tax consequences would result whether the attorney received warrants for his services or, instead, was paid cash which he then used to purchase such warrants.

The majority states (at page 1216) that the policy underlying the valuation rules of section 1.421–6, Income Tax Regs., is to require reasonable accuracy in the valuation of stock options and asserts that such policy is as applicable to independent contractors as it is to employees. Thus, the majority apparently believes that the application of section 1.421–6, Income Tax Regs., to the warrants received by the corporation herein is valid because its purpose is to defer taxability to the time when the value of such warrants can be accurately determined. However, its position is contradicted by its discussion (at pages 1220–1223) concerning the question of when the shareholders must recognize dividend income. Therein, the majority refuses to accept respondent's argument that, as a matter of law, the rules of section 1.421–6, Income Tax Regs., must be followed in determining the taxability of the shareholders with respect to the distribution of the warrants to them. In so doing, it acknowledges that the warrants may in fact be valued at some time prior to their exercise. If, as the majority implies, the warrants may be valued prior to exercise for purposes of determining taxability to the shareholders, I see no reason why they cannot similarly be valued prior to exercise for the purpose of determining the taxability of the corporation.

Furthermore, the majority states that under *Burnet v. Logan*, 283 U.S. 404 (1931), "the amount to a shareholder of a dividend of property other than cash will be determined at a later time if, as of the date of the dividend or of the declaration thereof, the fair market value of the property distributed cannot be ascertained." The majority also acknowledges, and subsequent case law has made it clear, that a transaction will be treated as "open" only in rare and extraordinary cases where the fair market value of the property cannot be ascertained. However, the majority fails to articulate why this might be one of those "rare and extraordinary" cases. I do not believe that the open transaction doctrine of *Burnet v. Logan*, *supra*, is applicable to the facts before us. I would conclude, consistent with my previous analysis with respect to the corporation, that the warrants can and should be valued when they were assigned to the shareholders.

Since I would hold that sections 1.61–15 and 1.421–6, Income Tax Regs., are invalid as to options received by independent contractors, and that the corporation and shareholders herein have taxable income upon receipt of the warrants, I respectfully dissent.

GOFFE, CHABOT, HAMBLEN, COHEN, and WRIGHT, *JJ.*, agree with this dissent.